**VIRGINIA:**

FILED
CIVIL INTAKE

2014 DEC 12  PM 3: 2

IN THE FAIRFAX COUNTY CIRCUIT COURT

JOHN T. FREY
CLERK, CIRCUIT COURT
FAIRFAX, VA

**2014-16088**

| | |
|---|---|
| **ICORE NETWORKS, INC.,** | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| **ALACRITY COLLECTIONS** | * |
| **CORPORATION,** | * |
| | * |
| <u>Serve:</u> | * |
| Susan K. Hayes, Resident Agent | * |
| 900 Bestgate Road, Suite 407 | * |
| Annapolis, Maryland 21401 | * |
| | * |
| Defendant. | * |

Case No. _____

## COMPLAINT

Plaintiff, iCore Networks, Inc., by counsel, hereby submits the following Complaint

against Defendant, Alacrity Collections Corporation:

## PARTIES

1.      Plaintiff is a corporation organized and existing under the laws of Delaware.

2.      Plaintiff's principal place of business is in McLean, Virginia.

3.      Plaintiff is in the business of providing, on a subscription basis, a variety of

cloud-based IT and communications services, including hosted communications services,

network management, unified applications services, voice and data solutions, on-demand video,

mobile applications, and other types of IT and communication services.

4.      Defendant is a corporation organized and existing under the laws of Anne

Arundel County, Maryland.

## FACTUAL BACKGROUND

5.      On or about December 11, 2013, Plaintiff and Defendant entered into a Customer Service Order Agreement (the "Agreement"), pursuant to which Plaintiff agreed to provide to Defendant certain services ordered by Defendant (the "Services").  A true copy of the Agreement is attached as **Exhibit A**.

6.      Defendant executed the Agreement.

7.      Plaintiff's "Universal Terms and Conditions of Services" (the "Universal Terms") are set out on Plaintiff's website at http://www.icore.com/about-icore/terms-and-conditions.aspx.

8.      Attached as **Exhibit B** is a true copy of the Universal Terms set out at Plaintiff's website at the time Defendant executed the Agreement.

9.      The Agreement incorporates the Universal Terms by reference and makes the Universal Terms a part of the Agreement.

10.      Pursuant to the Agreement, and upon signing the Agreement, Defendant acknowledged that it read the Universal Terms and agreed to be bound by the Universal Terms.

## BREACH OF CONTRACT

11.      Pursuant to the Agreement, Defendant subscribed to the provision of the Services for a term of 36 months (the "Initial Term").

12.      Defendant terminated the Agreement on or about early January 2014, which was before the expiration of the Initial Term.

13.      Defendant's termination of the Agreement was not due to Plaintiff's uncured breach pursuant to Section 3(c) of the Universal Terms.

2

14.     Pursuant to Section 3(b) of the Universal Terms, upon Defendant's early termination of the Agreement, which termination is not due to Plaintiff's uncured breach under Section 3(c), Defendant is obligated to pay to Plaintiff an early termination charge equal to all non-recurring and monthly recurring charges set forth in the Agreement.

15.     On or about January 22, 2014, Plaintiff issued an invoice to Defendant in the amount of $79,551.61 (the "Invoice"). A true copy of the Invoice is attached as **Exhibit C**.

16.     The amount due of $79,551.61 as stated in the Invoice represents the full amount of non-recurring and monthly recurring charges set forth in the Agreement.

17.     Defendant breached the Agreement by failing or refusing, despite demand, to pay the Invoice.

18.     Defendant breached the Agreement by terminating the Agreement before the expiration of the Initial Term because such termination was not due to Plaintiff's uncured breach pursuant to Section 3(c) of the Universal Terms.

19.     The anticipated damage to Plaintiff resulting from Defendant's early termination of the Agreement and breach of the Agreement, as contemplated at the time of the Agreement, include the following:

     (a)     Plaintiff incurs substantial upfront costs for the provision of services from third-party service providers and subcontractors.

     (b)     Plaintiff commits to its own subscription-based costs related to the provision of the Services during the Term.

     (c)     Plaintiff allocates substantial labor force resources to mobilize for the provision of the Services.

3

(d)    Plaintiff incurs substantial opportunity costs and lost profits.

20.    Accordingly, Defendant's early termination of the Agreement and breach of the Agreement has caused Plaintiff to incur direct, indirect, consequential, and incidental damages.

21.    As payment of the Invoice has not been received by Plaintiff within 30 days of the date of the Invoice, Plaintiff is entitled to recover, under Section 9(c) of the Universal Terms, pre-judgment and post-judgment interest at the lesser of 1.5% per month or the highest rate permitted by applicable law.

22.    Under Sections 9(c) and 14(c) of the Universal Terms, Plaintiff is entitled to recover all of its reasonable attorney's fees and other costs incurred to collect the Invoice and enforce its rights under this Agreement.

**WHEREFORE,** Plaintiff requests that the Court enter judgment in its favor, and against Defendant, in the amount of $79,551.61, plus pre-judgment and post-judgment interest at 1.5% per month; that the Court award to Plaintiff all of its reasonable attorney's fees, Court costs, and other costs incurred; and that the Court award such other and further relief as the Court deems appropriate under the circumstances.

Respectfully submitted,
**ICORE NETWORKS, INC.**
By Counsel

4

David N. Goldberg, VSB #33468
David E. Bateman, VSB #74660
**OFFIT KURMAN, P.C.**
8000 Towers Crescent Drive, Suite 1450
Tysons Corner, Virginia 22182
Telephone: (703) 745-1817
Facsimile: (703) 745-1835
dgoldberg@offitkurman.com
dbateman@offitkurman.com
(Counsel for Plaintiff)

4846-4932-6880, v. 1

# iCORE networks

## Customer Service Order Agreement

| Billing Information | Customer Installation Information |
|---|---|
| Company Name: Alacrity Collections Corporation | Company Name: |
| Address: 900 Bestgate Rd Ste 407 | Address: |
| City, State, Zip: Annapolis, MD 21401 | City, State, Zip: |
| Phone Number: 1-800-752-9663 | Phone Number: |
| Contact Name: Barry Allen | Contact Name: |

| Term Commitment (customer initial selection) | Service |
|---|---|
| ☑36 months ☐48 months ☐60 month_____ | ☐New ☐Existing ☐Renewal Effective Date: |

| VOICE APPLICATIONS SERVICES | Qty | Rate | NRC | MRC |
|---|---|---|---|---|
| **Packages** | | | | |
| Premium Enterprise Package – Unlimited local and long distance calling; Internet access | 15 | $54.00 | $810.00 | $810.00 |
| *See Addendum A for full feature list* | 1 | $34.00 | $34.00 | $34.00 |
| Fax Solution: Analog Line | | | | |
| **Voice Value Added Services** | | | | |
| Auto Attendant Customized call flow allowing callers to be automatically transferred to an extension without the intervention of a receptionist. | 1 | $5.00 | $150.00 | $5.00 |
| Fax to Mail: Faxing capability from the desktop computer, inbound and outbound.100 pages included. Usage based. | 12 | $10.00 | $0.00 | $120.00 |
| Call Recording: | 6 | $54.00 | $324.00 | $324.00 |
| Hunt Group: Distributes telephone calls from a single phone number to a group of several telephone lines. | 1 | $5.00 | $5.00 | $5.00 |
| Individual User Toolbar: toolbar accessibility for all users(Call logs, personalize phone options) | 12 | $3.00 | $36.00 | $36.00 |
| Toll Free Number: Telephone number that is free to the calling party. Usage based. | 1 | $.05/min | NA | $.05/min |
| **DATA APPLICATION SERVICES** | Qty | Rate | NRC | MRC |
| Dedicated Internet Access Circuit: Unmanaged broadband circuit monitored by iCore 50/10 mbps | 1 | $192.84 | $240.00 | $192.84 |
| Point-to-Point Dedicated Circuit: Fully managed, dedicated connection to iCore Network Application Center. T1(1.54mbps) | 1 | $358.80 | $333.80 | $358.80 |
| Network Monitoring Service: Comprehensive fault and network performance management service. | 1 | NA | $40.00 | $40.00 |
| | | Total | $1962.80 | $1925.64 |

This Customer Service Order Agreement ("Service Order") constitutes the agreement between iCore Networks, Inc. ("iCore") and the company listed above (the "Customer") for the provision of services ("Services") ordered by Customer as specified above. iCore's Universal Terms and Conditions of Service ("Universal Terms") are part of and incorporated into this Service Order and set out at www.icore.com. When Customer signs this Service Order, Customer agrees and acknowledges that it has read the Universal Terms as well as the Eg11 Disclosure at www.icore.com, and agrees to be bound by the terms and conditions set forth in both documents. In the event of any conflict between the Universal Terms and this Order Form, the Universal Terms shall prevail. iCore reserves the right to amend the Universal Terms at any time provided that such amendments do not materially affect the level or quality of Service provided by iCore. Any such amendments shall be effective on the next business day following the date on which the amendment(s) is posted at www.icore.com. Customer's continued use of a Service following any such amendment will constitute Customer's agreement to be bound by the terms and conditions of the revised Universal Terms.

| Customer Acceptance and Service Authorization | iCore Networks, Inc. Acceptance (must be executed by a VP or above) |
|---|---|
| Signature: | Signature: |
| Date: 12/8/2013 | Date: 12-11-13 |
| Print Name: BARRY ALLEN | Print Name: William Fleming |
| Print Title: IT MANAGER | Print Title: CEO |
| | iCore Sales Executive (Print Name) |

Rev. 091213



## ICORE NETWORKS, INC. UNIVERSAL TERMS AND CONDITIONS OF SERVICE

The iCore Networks, Inc. Universal Terms and Conditions of Service set forth below (hereinafter referred to as the "Universal Terms" or "Agreement") apply to Customer's use of the Service and Equipment (as defined below) provided by iCore Networks, Inc. ("iCore"), as well as Customer's access to the iCore website (the "Website").

**CUSTOMER IS ADVISED TO READ SECTION 2(d) CAREFULLY BEFORE USING THE SERVICE. THIS SECTION EXPLAINS THE OPERATION AND LIMITATIONS OF VOIP E911 EMERGENCY CALLS.**

---

**1.   Definitions.** The following definitions apply to this Agreement

**"Account"** means the account established by Customer for the use of the Service and Equipment.

**"Affiliate"** means any entity which directly or indirectly controls, is controlled by or is under common control with the subject entity. "Control", for purposes of this definition, means direct or indirect ownership or control of more than 50% of the voting interests of the subject entity.

**"Contractor"** means a person or entity, other than iCore, who is retained or used by iCore to assist in the sales, marketing, delivery, installation, provision, maintenance, servicing, repair, or operation of any iCore Service and/or Equipment.

**"Customer"** or **"you"** or **"your"** means the firm, corporation, or other entity which orders iCore's Service and Equipment, and who is responsible for the payment of charges and for compliance with this Agreement.

**"Customer Equipment"** refers to equipment or wiring that Customer acquires from a source other than iCore and used in conjunction with the Service.

**"Direct Inward Dialing"** or **"DID"** refers to a Service feature that allows callers from the PSTN to directly reach a specific network telephone number or User of the Service.

**"E911 Disclosure Notice and Acknowledgement"** or **"E911 Disclosure"** means the provisions set forth in the iCore E911 Disclosure Notice and Acknowledgement posted on the Website at www.iCore.com and/or attached to and incorporated by reference into the Customer Service Order Agreement stating iCore's policies regarding the availability and limitations of E911 Service and as may  be amended from time to time by iCore. In the event of any conflict or inconsistency between the E911 Disclosure provisions set forth on the Website and the E911 Disclosure attached to any Customer Service Order Agreement, the E911 provisions set forth on the Website are the most current provisions and shall apply and govern this Agreement and any Customer Service Order Agreement.

**"Equipment"** means equipment at Customer's location(s) that is directly provided or maintained by iCore and used in conjunction with the Service.

**"Internet Protocol"** or **"IP"** refers to a standard protocol designed for use in interconnected systems of packet-switched computer communication networks.

**"Public Switched Telephone Network"** or **"PSTN"** refers to the traditional circuit switched local telephone network, which connects telephone users with each other for the purpose of communications. In common usage, the term PSTN may also include local wireless networks.

**"Service"** refers to the services provided to Customer by iCore, including voice, data, and all other types of communications services. The specific services to be provided by iCore to Customer are listed in

the Customer Service Order Agreement executed by Customer and may be described in detail on the Website.

**"Service Activation Date"** means the date appearing on Customer's services invoice specifying when voice communications service was made available by iCore at any Customer location. In any situation where data services are made available prior to the Service Activation Date, the data services are being provided by iCore subject to the terms and conditions of this Agreement and Customer shall be financially responsible for paying for all such data services in accordance with the terms of this Agreement but the Service Activation shall still be determined based on the date when voice communications service was first made available by iCore at any Customer location.

**"User"** means any person or entity that obtains or uses iCore's Service and/or Equipment provided under this Agreement, regardless of whether such person or entity is authorized by Customer.

**"Voice over Internet Protocol"** or **"VoIP"** refers to a technology that enables people to use the Internet as the transmission medium for telephone calls by sending voice data in packets using IP rather than by traditional circuit switched technology.

**"Website"** means the iCore website identified by the domain name www.iCore.com, along with any content set forth therein, as updated from time to time by iCore in its sole discretion.

**2.   Terms and Conditions.**

**(a)   Acceptance.** By ordering, activating, using, or paying for the Service or Equipment, Customer agrees to be bound by this Agreement. iCore reserves the right, with or without notice, to amend or modify the Universal Terms, and Customer agrees to be bound by any amendment or modification. The E911 Disclosure is incorporated into this Agreement by reference. Modifications or amendments to the Universal Terms shall be effective at the time they are posted on the Website. To the extent Customer orders iCore Cloud Services, the terms and conditions set forth in Exhibit A attached hereto shall apply and govern iCore's provision and Customer's use of any such Cloud Services. Exhibit A shall neither apply nor have any force or effect unless Customer orders iCore Cloud Services as set forth in a Customer Service Order Agreement. To the extent Customer orders iCore Information Technology ("IT") Support Services, the terms and conditions set forth in Exhibit B attached hereto shall apply and govern iCore's provision and Customer's use of any such IT Support Services. Exhibit B shall neither apply nor have any force or effect unless Customer orders iCore IT Support Services as set forth in a Customer Service Order Agreement or otherwise documented by iCore after agreement with Customer. Exhibit A and Exhibit B are posted on the iCore Website at www.icore.com.

**(b)   Use.** Customer is responsible for all use of the Service and Equipment associated with the Account. Customer accepts full responsibility and liability for such use. The Service and Equipment provided under this Agreement may be used for any lawful purpose for which they are technically suited. Customer agrees not to utilize the Service or Equipment for any unlawful purpose. Customer shall

not use Services for transmitting or receiving any communication or material of any kind when the transmission, receipt or possession of such communication or material (i) would constitute a criminal offense, give rise to a civil liability, or otherwise violate any applicable local, state, national, or international law, or (ii) encourages conduct that would constitute a criminal offense, give rise to a civil liability, or otherwise violate any applicable local, state, national or international law. iCore, in its sole discretion, may terminate Service immediately and without advance notice if Customer violates any of the above restrictions, leaving Customer responsible for the all charges as set forth in Section 3(b).

(c) **Fraud.** Customer agrees to notify iCore promptly if it becomes aware of any fraudulent or unauthorized use of its Account, Service, or Equipment. iCore shall not be liable for any damages whatsoever resulting from fraudulent or unauthorized use of Customer's Account, and the payment of all charges to Customer's account shall be and remain the responsibility of Customer.

(d) **Limitations of E911 Service.** By using the Service and/or Equipment, Customer acknowledges the limitations of iCore E911 Service as described in the E911 Disclosure, as well as those set forth below. Customer agrees and acknowledges that while some individual services offer access to E911 Service, others may not. Customer is advised to thoroughly understand the iCore E911 Service and the options available. By accepting these Universal Terms, Customer acknowledges that it has received the information regarding the limitations of iCore E911 Services, has read, understands, and agrees to the terms and conditions of the E911 Disclosure, and assumes the risks associated with the iCore E911 Service limitations. iCore may disclose to the Federal Communications Commission that Customer has acknowledged the E911 Disclosure by virtue of Customer having accepted this Agreement.

(e) **Availability.** The Service and Equipment are offered subject to the availability of the necessary facilities, services, and equipment, and subject to the provisions of this Agreement. iCore shall not be responsible or liable for any delay(s) in installing or providing any Service or Equipment ordered by Customer.

(i) **Connectivity.** To the degree Customer orders any broadband circuit from iCore and the specific circuit bandwidth and/or speed requested by Customer is unavailable at the designated Customer location, iCore will make commercially reasonable efforts to provide the closest bandwidth and/or speed available under the circumstances and the provision of such reduced bandwidth and/or speed shall not constitute a default or breach of this Agreement or be grounds for Customer to terminate the Agreement or any Customer Service Order Agreement ("Service Order"). If the requested bandwidth and/or speed is unavailable at all or unavailable at the price designated by iCore in the Service Order, Customer, by giving iCore written notice within ten (10) business days of being notified by iCore that the requested bandwidth and/or speed is unavailable at all or unavailable at the price quoted in the Service Order, has the right to terminate the order for the specific broadband circuit ordered by Customer. If, within the enumerated ten (10) business day time period, Customer fails to provide written notice of termination of the specific broadband circuit ordered by Customer, Customer shall be deemed to have waived its right to terminate the broadband circuit. If the broadband circuit is available at the bandwidth and speed ordered by Customer but not at the price quoted in the Service Order and Customer has not terminated broadband circuit in accordance with the written notice requirements of this Section 2(e), Customer agrees to execute an addendum to the Service Order to reflect the revised price, bandwidth, and/or speed, as applicable.

(ii) **Access and Build-out.** iCore may charge Customer additional non-recurring charges and/or monthly recurring charges not otherwise set forth in the Service Order for such implementation where it is determined that it is necessary to extend the demarcation point, or through the provision of additional infrastructure, cabling, electronics or other materials necessary to reach or otherwise install the Customer premises. iCore will notify Customer of any additional non-recurring and/or monthly recurring charges as soon as practicable. Standard installation does not include core drilling, wiring extensions for excessive distances, installation of new conduit runs,

installation of water proof shielding, installation of aerial circuit runs, or removal of hazard materials, as determined by iCore at its sole discretion.

(f) **Compatibility.** The Service and Equipment may not be compatible with Customer Equipment, and iCore is not required to maintain or repair Customer Equipment, or modify the Service to make it compatible with Customer Equipment.

(g) **Right to Suspend.** iCore reserves the right to suspend, limit or discontinue offering or providing Service, when necessitated by conditions beyond its control, when Customer or any User is using the Service in violation of the provisions of this Agreement, or when Customer or any User is using the Service in violation of the law.

(h) **Limitations of Service and Equipment.** Customer or any User may not be able to utilize the Service or Equipment, if: (i) the Equipment or Customer Equipment fails; (ii) the power required to operate Customer's or any User's computer, router, or modem, if applicable, fails; (iii) Customer's or any User's computer experiences hardware or software problems and/or viruses; (iv) in situations where iCore is not the Internet service provider, Customer's or any User's Internet service provider fails to provide adequate services for any reason; (v) Customer's or any User's hardware or software is improperly installed; or (vi) Customer or any User is blocked or otherwise unable to access the iCore network. By using the Service and Equipment, Customer and its Users acknowledge that the Service and/or Equipment may be limited in certain circumstances and may not be available 100% of the time. iCore will not be liable for errors in transmission or for failure to establish connections. In addition, Customer acknowledges and agrees that the Service and/or Equipment may not be compatible with certain fax machines or firewalls.

(i) **Customer Responsibilities.** By using the Service and Equipment, Customer and all of its Users acknowledge that there are certain rules and regulations that may apply to the location(s) from which Customer and its Users are utilizing the Service, and that such rules and regulations may be materially different from jurisdiction to jurisdiction. Customer, on behalf of itself and all Users at Customer's premises agrees to abide by all rules and regulations, including the exportation of data from the U.S. or other applicable jurisdictions. With respect to Customer's use of the Service and/or any Equipment as well as any Customer Equipment, Customer shall be responsible for any claim or damages arising from or related to: libel; slander; invasion of privacy; infringement or unauthorized use of any copyright, trademark, trade name, service mark, or any other intellectual property right; interference with or misappropriation or violation of any proprietary or creative right; and any injury to any person, property, or entity arising out of the material, data, information, or other content used, received, or transmitted by Customer or any User; any act, error, or omission by Customer or any User. Customer shall also be responsible and liable for any personal injury, property damage, or death of any person caused, directly or indirectly, by Customer, any User, or any Customer employee, agent, or contractor, arising from or related to the installation, maintenance, location, condition, operation, failure, presence, use, or removal of the Service, Equipment, or any Customer Equipment.

(j) **Services.** Customer acknowledges and agrees that iCore does not have complete management and control nor can iCore prioritize voice traffic over other types of traffic (data, video, etc.) on any service or circuit which routes traffic through the public Internet. Accordingly, iCore shall not be responsible for any service interruption, degradation, delay, transmission error, operational failure, and/or unavailability (individually and collectively referred to as "Service Problem") at any location where Customer orders or uses an unmanaged service. For purposes of this Agreement, an "unmanaged service" means any Customer service or circuit (e.g., T-1, DSL, cable, Ethernet) which, instead of routing voice and data traffic directly to iCore's data center, routes traffic over the public Internet before it is sent to an iCore data center. Although iCore agrees to take commercially reasonable efforts to work with Customer to try to identify, address, and resolve any Service Problem on an unmanaged service ordered by Customer, iCore is unable to control the reliability or quality of traffic routed on an

unmanaged service. ICore is not responsible for any Service Problem experienced by Customer at any location where Customer orders or uses an unmanaged service. Customer shall not be entitled to any service credits or any other remedy, including, without limitation, a termination right under Section 3(c), for any Service Problem on any unmanaged service.

**(k)   Information and Installation Responsibilities.** Customer acknowledges and agrees that the Service may be comprised of multiple circuits and/or services ordered from ICore for installation at one or more designated Customer locations. The estimated in service date (EISD) for each Service and circuit ordered by Customer for each Customer designated location will be sent by ICore to Customer after Customer's execution of the Customer Service Order Agreement. Customer agrees and acknowledges that, in order for ICore to install the Service at each designated Customer location as of the EISD, Customer is obligated to provide to ICore requested information (e.g., complete list of telephone numbers to be ported to the ICore network, exact location of circuit installation and designated demarcation point, site survey information, equipment information, etc.) and documentation (e.g., completed and signed Letter of Agency) in a timely manner. Once the EISD for each service and circuit ordered for each designated Customer location has been sent to Customer, if, for any reason, Customer (i) fails to provide any requested information and/or documentation to ICore in a timely manner; and/or (ii) subsequently cancels or requests that the EISD for any service or circuit be moved to a later date, then Customer shall remain responsible and agrees to pay for all applicable monthly recurring charges, non-recurring charges, and any other applicable charges and fees (as described in the Customer Service Order Agreement executed by Customer) as well as applicable taxes for each service and circuit ordered by Customer as if the service and circuit was installed as of the EISD. Customer's financial obligation to pay shall apply irrespective of Customer's reason for failing to provide requested information and/or documentation in a timely manner or reason for cancelling or requesting a delay in any EISD and irrespective of whether the ICore service and/or circuit ordered by Customer is actually installed and used by Customer as of the EISD. The foregoing payment obligation as of the EISD shall not apply if the EISD is missed or delayed as a direct result of any delay in installing a circuit or service caused by ICore or any ICore service or equipment provider. In such situation, Customer's payment obligations shall commence on the date when the service is actually installed by ICore or would have been installed except to the extent any delay is caused by Customer's (a) failure to provide any requested information and/or documentation to ICore in a timely manner as describe above; and/or (b) cancellation or request that the EISD for any service or circuit be moved to a later date.

**(l)   Required Maintenance.** ICore reserves the right to perform maintenance on or upgrade its network, its infrastructure, the Website, the Service and Equipment, and Customer's Account, without prior notice or liability, even if such actions cause a partial or full disruption of the Service; provided, however, and subject to ICore's business needs, ICore will use commercially reasonable efforts to perform maintenance on and upgrades to its network and the Service in a manner so as to avoid unduly interfering with Customer's use of the Service. ICore may, in its sole discretion, add, change or delete features of the Website, features or functionality of the Service and Equipment, or features of Customer's Account.

**3.   Term and Termination.**

**(a)** Unless otherwise terminated pursuant to this Agreement, the Service is offered for an initial term of service (the "Initial Term") specified in the Customer Service Order Agreement ("Service Order"), which shall be a minimum of thirty-six (36) months and could be longer depending on the length of term selected by Customer in the Service Order. The Initial Term shall begin on the Service Activation Date and continue until the expiration of the Initial Term. If Customer orders installation of Service at more than one location, the Initial Term for all Customer locations shall begin on the Service Activation Date at the last location where the ICore Service is installed. For avoidance of doubt, Customer shall be and remain financially responsible for paying for ICore Service at each designated Customer location where

iCore Service is installed but the Initial Term for all Customer locations shall not begin until the Service Activation Date at the last location where the iCore Service is installed as set forth in any Customer Service Order Agreement or Customer Service Order Agreement Addendum signed by Customer within ninety (90) days of submission of the first Customer Service Order Agreement. Customer agrees and acknowledges that, for multi-location Service Orders, the Initial Term for those Customer locations installed prior to the last Customer location will be longer than the Term Commitment set forth in the original Customer Service Order Agreement. Following expiration of the Initial Term, this Agreement shall automatically renew for successive terms that are identical in length to the Initial Term (each, a "Renewal Term") unless and until either party notifies the other party in writing at least ninety (90) days prior to the end of the Initial Term or any Renewal Term that it does not wish to renew the Service Order. If Customer provides iCore with ninety (90) days prior written notice of its intent not to renew the Initial Term or any Renewal Term in accordance with this Section 3(a), Customer agrees and acknowledges that iCore, upon receipt of such written notice from Customer, shall have the right to: (i) request and receive pre-payment for all amounts that Customer might owe for the remainder of the Initial Term or Renewal Term that is not being renewed; and (ii) charge Customer at iCore's prevailing professional services rates for any services provided by iCore to Customer for discontinuing Customer's use of the Service and assisting with migrating Customer to another vendor. If, during the Initial Term or any Renewal Term, Customer adds any additional services to its use of the Service, the amount of Customer's monthly recurring charges shall, in accord with iCore's prevailing rates at the time, increase the sum set forth in the original Customer Service Order Agreement. The term for any such additional services shall be the longer of: (i) a minimum of twelve (12) months from the Service Activation Date for such additional services; or (ii) the remaining length of the unexpired Initial Term or Renewal Term. To the extent that the term for any such additional services extends beyond the Initial Term or any Renewal Term, the terms and conditions of this Agreement shall remain in full force and effect with respect to such additional services until the expiration of the term for such additional services.

**(b)   Early Termination.** If this Agreement is terminated by Customer prior to the expiration of the Initial Term or any Renewal Term and such termination is not due to iCore's uncured breach as set forth in Section 3(c) or if iCore terminates this Agreement pursuant to Section 2(b) or 3(c) due to Customer's uncured breach, Customer shall pay to iCore an early termination charge, which Customer agrees is reasonable, equal to all non-recurring and monthly recurring charges set forth in the Customer Service Order Agreement which would otherwise be due through the end of the Initial Term or Renewal Term in effect at the time, including all applicable taxes and fees. For avoidance of doubt, Customer agrees and acknowledges that the foregoing early termination charges shall apply even if Customer terminates the Agreement and/or any Customer Service Order Agreement prior to commencement of the Initial Term and prior to the Service Activation Date. The parties agree that the precise damages resulting from an early termination by Customer or termination by iCore due to Customer's breach are difficult to ascertain and the early termination charge set forth in this Section 3(b) is a reasonable estimate of anticipated actual damages and not a penalty. The early termination charge shall be due and payable within ten (10) days of the effective date of termination.

**(c)   Termination for Breach.** Either party may terminate this Agreement (or any Service Order) if the other party (a) is in material breach of this Agreement and such breach is not cured within thirty (30) days after the breaching party's receipt of written notice thereof, or (b) becomes insolvent, makes an assignment for the benefit of creditors, is adjudged bankrupt, or if a receiver is appointed over such party's assets. Each party must exercise its right of termination for the other party's uncured breach within thirty (30) days of discovering the other party's breach of this Agreement or any applicable Service Order or such specific breach shall be deemed to have been waived. Notwithstanding any other provision of this Agreement, iCore has the right to suspend Service, and terminate this Agreement for Customer's material breach, immediately upon written notice if any amount owed by Customer is delinquent for more than thirty (30) days from the invoice date.

**(d) Effect of Termination.** Upon the expiration or any termination of this Agreement, Customer shall immediately cease any and all use of and access to any iCore Service and any iCore Confidential Information. iCore shall have no liability from any termination of this Agreement provided that it is conducted in accordance with the terms of this Agreement. Sections 1 through 5, Section 9, Section 10, and Section 12 through 27 shall survive any termination or expiration of this Agreement.

**(e) Government or Regulatory Developments.** iCore has the right to terminate any Customer Service Order Agreement if, regardless of the cause or reason, iCore cannot legally provide some or all of the Equipment or Services for a period exceeding ten (10) days, including, without limitation, loss of governmental or regulatory authorizations required to provide the Equipment or Services; or, if changes in laws or regulations make the provision of some or all of the Services impracticable or illegal for iCore to install, maintain, or operate any of the Equipment or provide any Service.

### 4. Limitation of Liability

**(a)** iCore's liability for damages arising out of any mistake, interruption, omission, delay, error, or defect which occurs in the course of installing, providing, maintaining, or modifying Service and/or Equipment or for any other reason, shall in no event exceed an amount equivalent to the proportionate charge to Customer for the period during which the fault(s) occurred. In the event that Customer experiences a loss of service due to iCore's fault, negligence, act, error, or omission, iCore will provide Customer with a credit on a pro-rata basis for the period of time that the Service was unavailable to Customer. In order to receive a credit, Customer must provide iCore written notice within ten (10) days of the service interruption and the credit will be applied to a future Customer invoice.

**(b)** NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT OR ANY CUSTOMER SERVICE ORDER AGREEMENT, IN NO EVENT WILL ICORE, ITS DIRECTORS, OFFICERS, EMPLOYEES, AFFILIATES, AGENTS, AND CONTRACTORS, BE LIABLE TO CUSTOMER, ANY USER, OR ANY THIRD PARTY FOR ANY CLAIM, LOSS, EXPENSE, OR DAMAGE DUE TO LOSS OF REVENUES, PROFITS, SAVINGS, BUSINESS, OR GOODWILL, NOR WILL ICORE, ITS DIRECTORS, OFFICERS, EMPLOYEES, AFFILIATES AGENTS, AND CONTRACTORS, BE LIABLE TO CUSTOMER OR ANY THIRD PARTY FOR ANY INDIRECT, EXEMPLARY, SPECIAL, PUNITIVE, CONSEQUENTIAL, OR INCIDENTAL DAMAGES. THE FOREGOING LIMITATION OF LIABILITY SHALL APPLY, WITHOUT LIMITATION, TO ANY CLAIM, LOSS, EXPENSE, OR DAMAGE, RELATING TO OR ARISING FROM ANY MALFUNCTION OF ANY SERVICE, EQUIPMENT, OR FACILITY PROVIDED BY ICORE OR ANY OTHER SERVICE PROVIDER AS WELL AS THE FAILURE OR INABILITY TO ACCESS E911 SERVICE OR ANY EMERGENCY SERVICE.

**(c)** NOTWITHSTANDING ANY PROVISION IN THIS AGREEMENT OR ANY CUSTOMER SERVICE ORDER AGREEMENT, IN NO EVENT SHALL ICORE, ITS OFFICERS, DIRECTORS, EMPLOYEES, AFFILIATES, AGENTS, AND CONTRACTORS, BE LIABLE TO CUSTOMER OR ANY USER OF THE SERVICE AND/OR EQUIPMENT DUE TO THE INABILITY OF CUSTOMER, ANY USER, OR ANY OTHER PERSON OR PARTY TO BE ABLE TO DIAL 911 OR ACCESS AND/OR SPEAK TO 911 EMERGENCY PERSONNEL THROUGH SERVICES OR EQUIPMENT PROVIDED BY ICORE; OR ICORE'S SUSPENSION OR TERMINATION OF SERVICES IN ACCORDANCE WITH THESE UNIVERSAL TERMS. THE LIMITATIONS SET FORTH IN THIS SECTION 4 APPLY TO ALL CLAIMS, DAMAGES, AND ALLEGATIONS WHETHER BASED ON BREACH OF CONTRACT, BREACH OF WARRANTY, PRODUCTS LIABILITY, TORT, AND ANY AND ALL OTHER THEORIES OF LIABILITY.

**(d)** Except for iCore's gross negligence or willful misconduct, in no event shall iCore's total aggregate liability to Customer, including, without limitation, liability to any User, person, or persons whose claim or claims are based on or derived from a right or rights claimed by Customer or to any third parties for any and all claims arising from or relating to any Service Order, these Universal Terms, or any other claim or cause of action, whether in contract, tort, or otherwise, ex-

ceed the aggregate amount of charges paid by Customer to iCore during the six (6) month period immediately preceding the date of the occurrence of the event giving rise to the claim or cause of action. iCore shall have no liability whatsoever for any damage to, or loss of, any equipment or other property under the care, custody or control of Customer or any User unless caused by iCore's gross negligence or willful misconduct, in which case iCore's maximum liability is set forth above in this Section.

**(e)** Because some states and jurisdictions do not allow limitation of liability in certain instances, portions of the limitations set forth in this Section 4 may not apply to Customer if prohibited by law.

**(f)** No action against either party arising out of this Agreement may be brought by the other party more than one year after the cause of action has arisen.

### 5. No Warranty.

THE EQUIPMENT AND SERVICE ARE PROVIDED BY ICORE ON AN "AS IS" BASIS, AND CUSTOMER'S AND ITS USERS' USE OF THE EQUIPMENT AND SERVICE ARE AT CUSTOMER'S OWN RISK. WITHOUT LIMITING THE FOREGOING, AND EXCEPT FOR ANY THIRD PARTY MANUFACTURERS' WARRANTIES THAT MAY BE APPLICABLE TO THE EQUIPMENT PURCHASED BY CUSTOMER, ICORE MAKES NO REPRESENTATION OR WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR FUNCTION, WHETHER EXPRESS OR IMPLIED. ICORE MAKES NO WARRANTY THAT THE SERVICE OR EQUIPMENT WILL OPERATE UNINTERRUPTED OR ERROR FREE. ICORE DOES NOT WARRANT THAT ANY SERVICE WILL BE AVAILABLE ON A SPECIFIED DATE OR TIME OR THAT THE NETWORK WILL HAVE THE CAPACITY TO MEET THE DEMAND OF USERS DURING SPECIFIC HOURS. CUSTOMER MAY BE UNABLE TO ACCESS THE SERVICE AT ANY TIME AND DISCONNECTION FROM THE SERVICE MAY OCCUR FROM TIME TO TIME.

### 6. Equipment.

Customer is responsible for all costs at its premises, including, without limitation, its personnel, wiring, computer equipment, Internet access (in situations where iCore is not the Internet service provider), electrical power, and the like, necessary for the use of the Service and any Equipment.

### 7. Software.

iCore uses certain software and related components licensed by iCore from third parties. Customer shall not use any such third party software and related components except in conjunction with use of the Service and Equipment.

### 8. Third Party Networks and Network Monitoring.

**(a)** iCore utilizes the public Internet and third-party networks in conjunction with its provision of the Service and the Website. iCore makes no representation that the Internet or any third-party network will adequately protect the privacy of Customer's or any User's personal information, and iCore expressly denies any liability associated therewith.

**(b)** Monitoring. iCore may monitor Customer's Account and Customer's and Users' use of the Service to respond to service or technical problems; to monitor compliance with this Agreement or any Service Order; if there has been an actual or suspected violation of this Agreement or any Service Order; to assess or determine that the Service and any Equipment are properly implemented and configured; at Customer's request; or to protect the integrity of the iCore network or Customer's use of the Service, in any emergency situation, or any other situation in which iCore, in its good faith judgment, deems appropriate under the circumstances.

### 9. Financial Terms.

**(a)** Prices and Charges. In addition to paying for all applicable non-recurring and professional services charges, Customer shall, throughout the Initial Term and any Renewal Term, pay the monthly

recurring charges set forth in the Customer Service Order Agreement. All such monthly recurring charges shall apply irrespective of whether Customer decreases, abandons, and/or cancels the number of services that use the Service during such the Initial Term or any Renewal Term. Customer agrees and acknowledges that iCore may start billing, and Customer is obligated to pay, for data services once the data circuit ordered by Customer has been delivered at the designated Customer premises. iCore may increase, decrease, change, or modify any of its rates for any Service at any time; provided, however, that such changes shall not be effective until at least thirty (30) days after written notice is given to Customer. Notwithstanding Section 3(b), if iCore increases the rate to be paid for any Service, Customer shall be permitted to terminate any or all of the Service(s) provided by iCore, without incurring an early termination charge, if Customer gives iCore written notice of termination within thirty (30) days of receipt of iCore's notification of any rate increase. If Customer elects to terminate Service in accordance with this Section 9(a), Customer shall remain liable for any accrued charges owed prior to the effective date of termination. If Customer fails to give written notice of termination within thirty (30) days of receipt of iCore's written notice of a rate increase, Customer shall be deemed to have accepted the rate increase, waived its right to terminate, and this Agreement and all Service Orders shall remain in full force and effect.

**(b)** Taxes, Fees, and Professional Services.

**(i)** Taxes. Federal, state, local, county, municipal, and other government or regulatory agencies may assess taxes, including, without limitation, excise, franchise, sales, value-added, use, personal and real property taxes, surcharges and/or fees ("Taxes") on Customer's purchase and/or use of the Service and/or Equipment. These Taxes may change from time to time, with or without notice to Customer. Customer is responsible for the payment of all applicable Taxes now in force or enacted in the future. Such amounts are in addition to the charges paid for the Service and Equipment. If Customer is exempt from any or all Taxes, it must provide iCore with an original certificate that satisfies applicable legal requirements attesting to its tax exempt status. Tax exemption shall only apply from and after the date that iCore receives such valid certificate.

**(ii)** Fees. In addition to any Taxes imposed by governments or regulatory agencies, iCore reserves the right to charge or increase various fees ("Fees"), including, without limitation, activation fees, E911 Service fees, universal service fees, and regulatory recovery fees. Any imposition of or increase in Fees that are imposed by a government or regulatory agency or that are intended to recover costs associated with government or regulatory programs may, in iCore's sole discretion, be effective immediately upon posting to the Website. The imposition of or increase in any Fees shall not constitute a rate increase as described in Section 9(a) and shall not give Customer a right to terminate this Agreement or any Service Order pursuant to Section 9(a).

**(iii)** Professional Services. If, at any time during the Initial Term or any Renewal Term, Customer requests iCore to provide any type of support service(s) which is outside the scope of routine customer support (i.e., unrelated to an operational problem with the iCore network or iCore service) or a situation or matter not caused by iCore (e.g., equipment set up not requested during the initial installation; additional training after any requested formal training; questions about customer-provided equipment), iCore shall have the right to charge, and Customer agrees to pay, a professional services fee for any such support services provided by iCore to Customer which are outside the scope of routine customer support. As of January 1, 2013, the professional service fee in effect is up to two hundred and ninety-five dollars ($295) per hour with a thirty (30) minute minimum charge. The imposition of a professional services fee as set forth in this Section shall not constitute a rate increase as described in Section 9(a) and shall not give Customer a right to terminate this Agreement or any Service Order pursuant to Section 9(a).

**(c)** Billing and Payment.

**(i)** Payment. All iCore invoices are due upon receipt and all payments must be made in U.S. currency. Customer shall pay monthly recurring charges for any partial month during the Initial Term or any Renewal Term on a pro rata basis. Customer is solely

responsible for any and all charges incurred as the result of the use of the Service associated with its Account, whether or not such charges were authorized or intended. iCore may suspend, restrict, or cancel use of the Service and Equipment, if Customer does not make full payment of all charges by the due date. Any amounts not paid to iCore within thirty (30) days of the date of the applicable invoice shall accrue interest at the rate of one and one-half percent (1.5%) per month or the maximum amount allowed by law, whichever is less. Customer shall also reimburse iCore for all reasonable attorneys' fees and other costs incurred by iCore in connection with collecting delinquent payments or with Customer's breach of this Agreement. Customer shall be responsible for all sales, use, value added or other tax or duty arising from or related to this Agreement and the provision of Services and Equipment, except for taxes on iCore's net income.

**(ii)** Invoice and Statement Periods, Format and Delivery. Billing periods and invoice formats may vary. iCore reserves the right to change the billing period, invoice format, or method of delivery from time to time, with or without notice to Customer. Unless otherwise agreed, all invoices shall be delivered electronically via the email address on file for Customer's Account. Customer is obligated to keep its Account information accurate and current. An incorrect or obsolete email address shall not release Customer from any of its payment obligations.

**(iii)** Methods of Payment. In its sole discretion and in limited instances, iCore reserves the right to accept payment by credit card. Customer acknowledges and agrees that each credit card payment is subject to a credit card processing fee of twenty-five dollars ($25) and an additional charge of 0.04% of the amount due. In situations where iCore agrees to accept payment by credit card, iCore reserves the right to discontinue acceptance of payment by credit card at any time.

**(iv)** Prepayment. Unless otherwise agreed to in writing by iCore, all monthly recurring charges for Service and Equipment will be billed and paid one calendar month in advance. iCore has the right to bill and Customer shall pay for all non-recurring and professional services plus applicable taxes prior to the Service Activation Date. All usage and related charges will be billed and paid in arrears as and when they are incurred and remain subject to the payment terms set forth in this Agreement.

**(v)** Billing Disputes. If Customer believes that it has been charged in error, or if Customer believes that it is due a credit or refund, Customer must notify iCore in writing within thirty (30) days after delivery of iCore's invoice. Any billing disputes must be in writing, using the iCore Credit Request Form, including a detailed statement describing the nature and amount of the disputed charge(s) and the reason(s) why a credit or refund is being requested, and sent via certified or overnight mail, return receipt requested, to the attention of:

Billing Department
iCore Networks, Inc.
7900 Westpark Drive, Suite A-315
McLean, Virginia 22102

Customer shall cooperate fully with iCore to promptly address and attempt to resolve the disputed charge(s). If Customer fails to provide written notice of dispute within the enumerated thirty (30) day deadline, the charges and invoice will be considered correct and binding on Customer. Irrespective of the foregoing, Customer shall pay the full amount of the invoice, including the disputed amounts, in a timely manner and in accordance with the payment terms set forth in this Agreement.

**(d)** Service Suspension, Termination and Restoration. iCore may suspend or terminate Customer's Service, and may terminate this Agreement, if Customer fails to meet any or all of its payment obligations. If Customer's Service has been suspended or terminated, iCore may, at its sole option, choose to restore or re-establish Customer's Service prior to the payment of all charges due. Such restoration or re-establishment shall not be construed as a waiver of iCore's right to receive full payment for all charges due or as a waiver of any rights to suspend or disconnect Service for non-payment of any such charges due and unpaid or for the violation of any provision of this Agreement; nor shall the failure to suspend or disconnect Service for non-payment of any past due amount operate as a waiver or estoppel to suspend or disconnect Service for non-

payment of such Account or of any other past due Account. If Service is suspended for non-payment of charges, it will be only restored when all charges are paid in full and at iCore's discretion.

**(e)** **Authorization to Verify Credit Rating.** Customer agrees to supply iCore with the information necessary to verify Customer's credit rating prior to providing Customer with access to any Service or Equipment. iCore may also, during the term of this Agreement, update its information regarding Customer's credit rating without notice to Customer.

**(f)** **Deposit.** If iCore determines, prior to providing Customer with access to any Service or Equipment, or during the term of this Agreement or any Service Order, that it requires a deposit to ensure Customer's payment, Customer may be required to provide a deposit. In the event iCore requires a deposit, the deposit will be held and applied as required by law. iCore may apply Customer's deposit to past due obligations as well as to any fees or other assessments to Customer's Account.

**10.   Trademarks.**

Customer shall not to use any of iCore's trade names, trademarks, service marks, or logos without iCore's express written consent.

**11.   Service Disconnection.**

iCore reserves the right to terminate the Service or Customer's use of the Equipment in the event Customer or any User is in violation of this Agreement. iCore may be required by law to interrupt the service in the event it causes interference to the iCore network, any party, or any equipment.

**12.   Indemnification.**

**(a)** iCore shall, at its expense, indemnify, defend and hold harmless Customer, its officers, directors, employees, agents, and contractors, from and against any third party claim, action, proceeding, liability, loss, damage, cost and expense, including reasonable attorneys' fees and court costs to the extent caused by the negligence or willful misconduct of iCore and arises from: (a) any bodily injury or death to any person or persons or damage to tangible personal property (which, for the avoidance of doubt, does not include software or data) directly caused by iCore while at Customer's physical location(s); and (b) the iCore Service infringing a third party's rights under any United States registered patent, copyright, or trademark.

**(b)** Customer shall, at its expense, indemnify, defend and hold harmless iCore, its officers, directors, employees, agents, and contractors, from and against any and all losses, damages, claims, allegations, causes of action, liabilities, penalties, fines, costs and expenses, including, without limitation, reasonable attorneys' fees and court costs, arising from or relating to: (i) any act, error, omission, fault, negligence, or misconduct of Customer or any User of the Service or Equipment; (ii) any breach by Customer of any term or condition of any Service Order or this Agreement or Customer's breach of any warranty, representation or covenant in any Service Order or this Agreement; (iii) any claim by any employee or invitee of Customer or User other than a claim based on the gross negligence or willful misconduct of iCore; (iv) any claim by any customer of Customer, User, or any other third party relating to, or arising from, Customer's use of the Services or Equipment; or (v) violation of any law or regulation by Customer, any User, or any Customer employee, contractor, or agent.

**(c)** Each party's indemnity obligations are subject to the following: (i) the aggrieved party shall promptly notify the indemnifier in writing of the claim; (ii) the indemnifier shall have sole control of the defense and all related settlement negotiations with respect to the claim (provided that the indemnifier may not settle or defend any claim unless it unconditionally releases the aggrieved party of all liability); and (iii) the aggrieved party shall cooperate fully to the extent necessary, and execute all documents necessary for the defense of such claim.

**13.   Confidentiality.**

**(a)** Each party (a "Receiving Party") acknowledges that it and its employees, contractors, or agents may, in the course of providing or using the Services and/or otherwise satisfying its obligations hereunder, be exposed to or receive information which is proprietary or confidential to the other party (a "Disclosing Party"). Any and all such information in any form obtained by a Receiving Party or its employees, contractors, or agents in the provision or use of the Services or the satisfaction of such party's obligations under this Agreement, including but not limited to the financial terms of this Agreement or any Service Order, product and business information, financial information, trade secrets, know-how and information regarding processes, shall be deemed to be the confidential and proprietary information ("Confidential Information") of the Disclosing Party. The Receiving Party agrees (a) to hold all Confidential Information in strict confidence; (b) to disclose Confidential Information only to employees and/or contractors of the Receiving Party who have a need to know such Confidential Information and who are obligated to hold such Confidential Information in strict confidence; and (c) not to copy, reproduce, sell, assign, license, market, transfer or otherwise dispose of, give, or disclose such Confidential Information to third parties, or to use such Confidential Information for any purposes whatsoever other than in connection with the Receiving Party's performance under this Agreement.

**(b)** Confidential Information shall exclude all information, which (a) is at the time of disclosure or thereafter becomes a part of the public domain through no act or omission of the Receiving Party, its employees, contractors, or agents; (b) was in the Receiving Party's possession as shown by written records prior to the disclosure and had not been obtained by Receiving Party either directly or indirectly from the Disclosing Party; (c) is hereafter disclosed to the Receiving Party by a third party who did not acquire the information directly or indirectly from the Disclosing Party hereunder; (d) was independently developed by the Receiving Party without use of the Disclosing Party's Confidential Information, as evidenced by written records; or (e) was required by law to be disclosed, but only to the extent and for the purposes of such required disclosure.

**14.   Governing Law and Dispute Resolution.**

**(a)** This Agreement and the terms of any Customer Service Order Agreement(s) and any addendum thereto, shall be governed by and enforced according to the laws of the Commonwealth of Virginia without giving effect to any conflicts of laws rules.

**(b)** In the event of any controversy or claim arising from or related to this Agreement, its performance or interpretation, the parties, in good faith, will initially attempt to resolve the dispute between them. Except for disputes, controversies, claims or collection efforts regarding Customer's failure to pay any charges, amounts or fees invoiced to Customer, any and all disputes, controversies and claims arising out of or relating to this Agreement or any Customer Service Order Agreement(s), including its/their validity, shall be handled, determined, and resolved by arbitration conducted in Fairfax County, Virginia, before one (1) arbitrator in accordance with the Commercial Arbitration Rules and Mediation Procedures then in effect of the American Arbitration Association. The arbitrator's award shall be final and binding on the parties, and judgment confirming such arbitration award may be entered thereon in any court having jurisdiction over such proceedings. Each party shall bear its own costs and expenses of preparing and presenting its case and shall bear an equal share of the expenses and fees with respect to the arbitration. The arbitrator shall not be empowered to award damages in excess of direct compensatory damages and shall not be authorized to award special, indirect, punitive, incidental, or consequential damages, and each party irrevocably waives any damages in excess of direct compensatory damages.

**(c)** **Action to Collect Charges.** Notwithstanding Section 14(b) above, the parties hereby agree that any disputes, controversies, claims or collection efforts regarding Customer's failure to pay any charges or fees invoiced to Customer arising from or relating to this Agreement including any Service Order, may be brought in the state courts in Fairfax County, Virginia or federal court in Alexandria, Virginia. The parties hereby consent and submit to the exclusive jurisdiction of such courts. Each party hereto waives any objection based on forum non- conveniens and waives any objection to venue

of any action instituted hereunder to the extent that an action is brought in any court identified above. Each party irrevocably consents to personal jurisdiction and venue exclusively in, and agrees to service of process issued or authorized by, any such court identified above. The parties also waive any right to jury trial in connection with any action or litigation in any way arising out of or related to Customer's failure to pay any charges or fees invoiced to Customer under this Agreement or any Service Order. Furthermore and notwithstanding Section 14(b) above, ICore shall be reimbursed for all attorneys' fees and costs in the event it institutes any action to collect any amounts owed for Service and/or Equipment under this Agreement or any Service Order. In the event ICore is required to initiate such an action, it shall not be limited to arbitration.

### 15. Severability.

This Agreement is made subject to all present and future valid orders and regulations of any regulatory body or court having jurisdiction over the subject matter hereof and to the laws of the United States, any of its states or any foreign governmental agency having jurisdiction. In the event that any of the provisions of this Agreement or any part thereof shall be determined by a competent authority to be invalid, unlawful or unenforceable to any extent, such provision or part thereof shall to that extent be severed from the remaining provisions of this Agreement which shall continue to be valid and enforceable to the fullest extent permitted by law.

### 16. Notice.

**(a) To Customer:** Unless expressly stated otherwise in this Agreement, in the event ICore is required or desires to provide Customer with notice under this Agreement, it will provide electronic notice to the e-mail address on file. In the event that Customer changes its e-mail address, Customer shall advise ICore immediately in writing. By Customer's acceptance of these Universal Terms, Customer agrees to electronic delivery of all required notifications including invoices, unless otherwise provided for herein.

**(b) To ICore:** Unless expressly stated otherwise in this Agreement, in the event Customer is required or desires to provide ICore with notice, all correspondence must be in writing and sent, via certified mail, return receipt requested, or overnight courier service, to the following address:

Chief Financial Officer
iCore Networks, Inc.
7900 Westpark Drive, Suite A-315
McLean, Virginia 22102

### 17. Waiver.

The failure of either party to enforce or insist upon compliance with any of the provisions of this Agreement or the waiver thereof, in any instance, shall not be construed as a general waiver or relinquishment of any other provision of this Agreement.

### 18. Binding Effect.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and assigns and any User who uses the Services under Customer's Account.

### 19. Assignment.

Customer shall not assign any of its rights or obligations under this Agreement, or transfer ownership of the Account or any Service or Equipment, without ICore's prior written consent.

### 20. Amendment.

ICore reserves the right, with or without notice, to amend or modify these Universal Terms by posting such amendment or modification on the Website, and Customer agrees to be bound by any amendment or modification. Except as stated above in this Section 20 and subject to the terms and conditions of this Agreement, this Agreement may not be amended by Customer except by a written document executed by both parties.

### 21. Entire Agreement and Merger.

This Agreement, along with the Customer Service Order Agreement(s) and the E911 Disclosure, supersedes and merges all prior agreements, promises, understandings, statements, representations, warranties, indemnities, covenants, and all inducements to the making of this Agreement relied upon by either party, whether written or oral, and embodies the parties' complete and entire agreement with respect to the subject matter hereof. Subject to Sections 2(a) and 20, no statement or agreement, oral or written, shall vary or modify the written terms hereof in any way whatsoever.

### 22. Independent Contractors.

ICore and Customer are independent contractors and any Service Order(s) and this Agreement do not establish any relationship of partnership, joint venture, employment, franchise or agency between the parties. Neither party has the power to bind the other or incur obligations on the other's behalf without the other party's prior written consent.

### 23. Basis of Bargain; Failure of Essential Purpose.

Customer acknowledges and agrees that ICore has established its prices and entered into one or more Customer Service Order Agreements in reliance upon the limitations and exclusions of liability and the warranty disclaimers set forth in these Universal Terms are an essential basis of the bargain between the parties and are material terms of this Agreement. The parties agree that the limitations and exclusions of liability and disclaimers specified in these Universal Terms will survive and apply even if found to have failed their essential purpose, and Customer hereby waives its right to contest the enforceability of any provision of these Universal Terms by reason of such failure.

### 24. Third Party Beneficiaries.

ICore may use or rely on one or more licensors, service providers, and/or equipment providers or equipment lessors whose products equipment, and/or services are incorporated into, provided in conjunction with, or licensed with, the Services and/or Equipment provided by ICore, and each such licensor, service provider, equipment provider and equipment lessor is expressly made a third party beneficiary under the applicable Customer Service Order Agreement(s) and this Agreement. Such licensor, service provider, equipment provider, and equipment lessor shall have the right to enforce the terms and conditions of the Customer Service Order(s) and this Agreement respecting any terms affecting such licensor, service provider, equipment provider, or equipment lessor as if such person, company, or entity were a party to the Customer Service Order(s) and/or this Agreement.

### 25. Facsimile Transmission/Counterparts.

This Agreement including any Service Orders may be executed and delivered by facsimile or email, and upon receipt such transmission shall be deemed delivery of an original. This Agreement including any Service Orders may be executed in several counterparts each of which when executed shall be deemed to be an original, and such counterparts shall each constitute one and the same instrument.

### 26. Force Majeure.

Neither party to this Agreement shall be liable to the other for any failure or delay in performance by circumstances beyond its control, including, without limitation, acts of God, flood, fire, labor difficulties, governmental action, or terrorism, provided that the party seeking to rely on such circumstances gives written notice of such circumstances to the other party hereto and uses reasonable efforts to overcome such circumstances.

### 27. Interpretation of Agreement.

This Agreement and any Service Order will be construed and interpreted fairly, in accordance with the plain meaning of its terms, and there will be no presumption or inference against the party drafting this Agreement or any Service Order in construing or interpreting any of the provisions contained in this Agreement or any Service Order. In the event of any inconsistency between or among any Service Order, the terms and conditions contained in the main body of this Agreement, or any exhibit, the following order of precedence

shall apply and govern: (1) the applicable Service Order; (2) the terms and conditions contained in the main body of this Agreement; and (3) any exhibit to this Agreement. If any Service provided or provisioned by ICore is undetermined by the Service Order as being provided pursuant to the terms and conditions contained in the main body of this Agreement, Exhibit A. or Exhibit B, ICore shall have the exclusive right to designate which document shall apply and govern with respect to such Service.

## EXHIBIT A

## ICORE NETWORKS, INC. CLOUD SERVICES AGREEMENT

**GENERAL TERMS AND CONDITIONS**

### 1. THE CLOUD SERVICES AGREEMENT.

The General Terms and Conditions set forth in this document (hereinafter referred to as the "Terms and Conditions") apply to your purchase and use of the Services (as defined below) provided by iCore Networks, Inc. ("iCore").

This Cloud Services Agreement incorporates the following documents by reference: (i) the Customer Service Order Agreement that describes the Services you are buying as well as the related fees and Services Term; (ii) these General Terms and Conditions containing the general terms and conditions applicable to all Services, and (iii) the Acceptable Use Policy. When we use the term "Cloud Services Agreement" or "Agreement" in any of these documents, we are referring collectively to all of them. The Agreement is effective as of the last date the Customer Service Order Agreement is executed between you and iCore.

If you purchase any information technology support services from iCore, iCore will provide any such information technology support services in accordance with and subject to the Information Technology Support Services Agreement set forth in Exhibit B to the Universal Terms. If, for whatever reason, the Initial Term or any Renewal Term of this Cloud Services Agreement expires or is terminated prior to the expiration or termination of the Initial Term or any Renewal Term of the Information Technology Support Services Agreement set forth in Exhibit B, the Information Technology Support Services Agreement shall remain in full force and effect in accordance with its terms and conditions and shall not be affected by any termination or expiration of this Cloud Services Agreement.

### 2. DEFINED TERMS.

Some words used in the Agreement have particular meanings:

"Acceptable Use Policy" or "AUP" means the iCore Acceptable Use Policy posted at www.icore.com as may be amended from time to time by us in our sole discretion.

"Affiliate" or "affiliate" means any entity which directly or indirectly controls, is controlled by, or is under common control with the subject entity. "Control", for purposes of this definition, means direct or indirect ownership or control of more than 50% of the voting interests of the subject entity.

"Billing Commencement Date (BCD)" means, for each of the Services, the earlier of (i) the date on which you use (except during the Acceptance Period) the Services or (ii) the date iCore notifies you in writing that the installation of the Services is complete. You will have three (3) business days after such use or notification to notify iCore of any deficiency ("Acceptance Period"). Such notice to iCore shall include a detailed written description of the deficiency in the Service. The Services shall be deemed accepted by

you unless you provide iCore with written notice to the contrary during the Acceptance Period. Upon timely written notice to iCore of a deficiency, (i) iCore will remedy the Services deficiency and notify you of such remedy at which time a new Acceptance Period shall begin, and (ii) iCore will delay billing until the Services are accepted in accordance with this provision.

"Business Day" or "Business Hours" means 9:00 a.m.–5:00 p.m. Monday through Friday, United States eastern time, excluding federal public holidays in the United States and holidays otherwise observed by iCore.

"Cloud Services" means iCore's provision for your use of the specific services and features described in the Customer Service Order Agreement.

"iCore", "we", "us", and "our" means iCore Networks, Inc.

"Confidential Information" means all information disclosed by one of us to the other, whether before or after the effective date of this Agreement, that the recipient should reasonably understand to be confidential including: (i) for you, all information transmitted to or from, or stored on, your Hosted System, (ii) for iCore, unpublished prices and other terms of service, audit and security reports, product development plans, data center designs (including non-graphic information you may observe on a tour of a data center), and other proprietary information or technology, and (iii) for both of us, information that is marked or otherwise conspicuously designated as confidential. Confidential information shall also include any information disclosed in writing, verbally, or visually that, due to its character, nature, or method of transmittal, a reasonable person under like circumstances would treat as confidential and proprietary, even in the absence of a "confidential" or "proprietary" designation on such information and the absence of any subsequent written confirmation or identification of such information. Information that is independently developed by one of us, without reference to the other party's Confidential Information, or that becomes available to one of us other than through violation of the Agreement or applicable law, shall not be "Confidential Information" of the other party.

"Content" means any and all information, files, applications, email, software (including machine images), data, text, audio, music, graphics, recordings, programs, video, images, or other media or content. you or any End User (a) cause to interface with the Services, (b) upload to the Services under your account, or (c) install, upload, store, or transfer on, from or through the Cloud Services.

"End User" or "end user" means any individual or entity that directly or indirectly through another user: (a) accesses or uses your Content; or (b) otherwise accesses or uses the Services under your account.

1

"Hosted System" means a combination of hardware, software and networking elements that comprise an information technology system. Depending on the Services you are buying from us, the Hosted System may consist of a dedicated system for your use only, or the right to use certain parts of a shared multi-tenant system that iCore maintains for many customers, or a combination of some dedicated elements and some shared elements.

"Customer Service Order Agreement" means the written agreement document describing the specific Hosted System, Cloud Services, and/or Supplementary Services you are buying from iCore as well as the agreed upon fees, term commitment, and any other terms and conditions contained in such document, all of which are incorporated by reference into this Agreement.

"Services" means the specific Cloud Services ordered by Customer as described in the Customer Service Order Agreement.

"Supplementary Services" means those services (e.g., database administration services, training, assistance or support for the application that you operate on your Hosted System), other than the Cloud Services, which you purchase from iCore pursuant to the Customer Service Order Agreement or a separate written agreement or Statement of Work executed by both parties.

"you" and "your" means the customer entering into and executing the Customer Service Order Agreement.

3. OUR OBLIGATIONS AND DISCLAIMERS.
3.1 iCore's obligation to provide Services is contingent on your satisfaction of iCore credit approval criteria. iCore will provide the Cloud Services in accordance with the Customer Service Order Agreement. iCore will perform any Supplementary Services in a good and professional manner. Subject to the terms of the Agreement, the Cloud Services will be provided during the Services Term Commitment set forth in the Customer Service Order Agreement and during any Renewal Term. Following the expiration of Services Term Commitment, this Agreement shall automatically renew for successive terms that are identical in length to the original Services Term Commitment (each, a "Renewal Term") unless and until either party notifies the other party in writing at least ninety (90) days prior to the end of the Services Term or Renewal Term then in effect that it does not wish to renew the Agreement.

3.2 iCore represents and warrants the following: (i) iCore will comply with all applicable laws respecting the performance by iCore of its duties and responsibilities under this Agreement; and (ii) iCore's execution of this Agreement and provision of the Services do not breach any other agreement or obligation to which iCore is or was a party.

3.3 Any public or private IP address allocated for you to use as a part of the Cloud Services will remain allocated to you until (i) you request a new IP address or a new IP address block; (ii) your Cloud Services are terminated for any reason; or (iii) we decide to change any IP address, which we may do at any time and in our sole discretion by providing you with ten (10) days' prior notice of the change in accordance with the notice provisions below. Upon termination of this Agreement, you may no longer use any

IP addresses or address blocks that we provided for your use in connection with the Cloud Services. Any customer on a shared multi-tenant system is subject to having its IP address changed at any time without prior notice.

4. YOUR OBLIGATIONS.
4.1 Your installation of, use of, and access to the Services is at your sole discretion and risk and you are solely responsible for any damages to your equipment, software, and the loss of your Content that results from the use thereof. You are also responsible for all activities that occur under your account, regardless of whether the activities are undertaken by you, any End User, your employees, or a third party (including your customers, contractors, or agents) and, except to the extent caused by our breach of this Agreement, we and our affiliates are not responsible for unauthorized access to your account. You will contact us immediately if you believe an unauthorized third party may be using your account or if your account information is lost or stolen.

4.2     You are solely responsible for the selection, compatibility, licensing, development, accuracy, performance, operation, maintenance, and support of all Content. We may immediately (and without prior notice) block access to any Content on the Cloud Services (i) that we believe violates the law, misappropriates or infringes the intellectual property rights of a third party, or violates the terms and conditions of this Agreement; or (ii) pursuant to the Digital Millennium Copyright Act, a subpoena, or an order issued by a court or government agency.

4.3 You acknowledge that you bear the sole responsibility for the security of the Cloud Services. You must use reasonable security precautions in connection with your use of the Cloud Services. You agree to implement security measures that are commercially reasonable for your use of the Cloud Services, including, without limitation, encryption technologies, password and user ID requirements, and procedures regarding the application of security patches and updates. You agree to keep your password and other account details secret, and not share them with anyone else, in order to prevent unauthorized access to your account. NEITHER ICORE NOR ANY OF ITS EMPLOYEES, AGENTS, REPRESENTATIVES, SERVICE SUPPLIERS OR LICENSORS WILL BE LIABLE FOR ANY UNAUTHORIZED ACCESS (I.E., HACKING) INTO THE CLOUD SERVERS, THE CLOUD SERVICES, OR YOUR TRANSMISSION FACILITIES, PREMISES OR EQUIPMENT, OR FOR UNAUTHORIZED ACCESS TO YOUR CONTENT, PROGRAMS, PROCEDURES, OR INFORMATION THEREON, UNLESS AND ONLY TO THE EXTENT THAT THIS DISCLAIMER IS PROHIBITED BY APPLICABLE LAW.

4.4 If your contact information or other account information changes, you must update your account details promptly. After you create your iCore account, you may upload, download and access your Content and materials submitted by you for which you have a legal right to copy, publish, share, store, or otherwise use. You must comply with all laws applicable to your use of the Services and with the Acceptable Use Policy. You must cooperate with iCore's reasonable investigation of Service outages and interruptions, security problems, and any suspected breach of the Agreement. You are responsible for keeping your

2

account permissions, billing, and other account information up to date using the ICore administrative portal or via another ICore defined process. You must pay when due the fees for the Services stated in the Customer Service Order Agreement or any other agreement between us.

**4.5** You shall not use the Services or the ICore network or infrastructure to transmit, distribute or store material: (i) that violates any law or regulation, (ii) which materially interferes with or adversely affects the Cloud Services, the ICore network or any infrastructure, or any third party, and/or (iii) that is tortious or violates any third party right or ICore's AUP. The AUP is part of this Agreement. You are required to use the Cloud Services in accordance with the AUP. You agree to cooperate with any reasonable investigation by us regarding an actual or potential violation of the AUP

**4.6.** Any third party content, such as software applications provided by third parties, may be made available directly to you by other companies or individuals under separate terms and conditions, including separate fees and charges. Because we do not test or screen any third party content, your use of any third party content is at your sole risk and liability.

**4.7** You are solely responsible for selecting the ICore Services that are most suitable for your business needs. You are also responsible for properly using the Services and taking your own steps to maintain appropriate security and protection of all of your Content stored on the Services, which may include the use of encryption technology to protect your Content from unauthorized access and/or use. You may not sell, transfer or sublicense any of the Services to any other entity or person, except that you may retain agents and contractors to assist with your use of the Services.

**4.8.** You will be deemed to have taken any action that you permit, assist or facilitate any person or entity to take related to this Agreement, your Content, or use of the Services. You are responsible for your End Users' use of your Content and the Services. You will ensure that all End Users comply with your obligations under this Agreement and that the terms of your agreement with each End User are consistent with this Agreement. If you become aware of any violation of your obligations under this Agreement by an End User, you will immediately terminate such End User's access to your Content and the Services.

**4.9** You represent and warrant to us that: (a) you or your licensors own all right, title, and interest in and to your Content or you are authorized to use your Content in accordance with this Agreement; (b) you have all rights in your Content necessary to grant the rights contemplated by this Agreement; and (c) none of your Content or End Users' use of your Content or the Services will violate the Acceptable Use Policy or any applicable law.

**4.10** You represent and warrant to us that (i) the information you provide in connection with your registration for, subscription to, and use of the Cloud Services is accurate and complete; (ii) no Content you upload to or store on the Cloud Services is illegal, defamatory, malicious, harmful, or discriminatory based on race, sex, religion, nationality, disability, sexual orientation, or age; (iii) you accurately and adequately disclose how you collect and treat data collected from visitors to any website or users of any application you offer on the Cloud Services; (iv) your use of the Cloud Services will comply with all applicable laws, rules and regulations; (v) you will not attempt to circumvent or disable any of the security-related, management or administrative features of the Cloud Services; (vi) you have obtained all consents and licenses required for both of us to legally access and use all software you place on the Cloud Services without infringing any ownership or intellectual property rights; (vii) the execution and delivery of this Agreement will not conflict with or violate any provision of your charter, by-laws or other governing documents; and (viii) you have otherwise taken all necessary steps to legally execute this Agreement.

**4.11** You may not use the Cloud Services for any application where a failure of those Cloud Services could result in death, serious injury, environmental damage, or property damage. Examples of prohibited uses include medical life support devices, water treatment facilities, nuclear facilities, weapons systems, chemical facilities, mass transportation, aviation and flammable environments. You acknowledge that we make no assurances that the Cloud Services are suitable for any high-risk use.

**4.12 EMAIL SERVICES.**

**4.12.1 Access.** You may access your email services over the web via the ICore Cloud Services control panel or via an ICore-provided API. ICore may modify its control panel or APIs at any time, or may transition to new APIs.

**4.12.2 Management of the Service.** ICore will provision your initial email environment and add mailboxes. Unless otherwise set forth in the Customer Service Order Agreement, you are responsible for managing your email service, including adding wireless or other service components, adding storage capacity, managing settings, and configuring spam filters.

**4.12.3 Filtering.** ICore will make commercially reasonable efforts to provide email filtering services designed to filter spam, phishing scams, and email infected with viruses but does not guarantee that it will be able to prevent any spamming, phishing, and/or viruses. ICore recommends that you employ additional security measures, such as a desktop virus scanner and firewalls, on computers that are connected to the Internet. ICore will use commercially reasonable efforts to deliver your email messages. Third party filtering services may from time to time prevent successful delivery of your email messages. You acknowledge that the technological limitations of the filtering service will likely result in the capture of some legitimate email and the failure to capture some unwanted email, including email infected with viruses. You hereby release ICore and its employees, agents, affiliates, and third party suppliers from any liability for damages arising from the failure of ICore's filtering services to capture unwanted email or any email infected with a virus from the capture of legitimate email, or from a failure of your email to reach its intended recipient as a result of a filtering service used by the recipient or the recipient's email service provider.

3

**4.12.4 Memory Limitations.** Email that exceeds the storage limit when received may be permanently lost. You may adjust the storage capacity of your individual mailboxes by contacting the iCore Helpdesk or submitting a ticket to iCore, and it is your obligation to monitor and adjust the storage capacity of individual mailboxes as needed. An individual email message that exceeds the per-message size limit of 25 MB (including attachments) may also be permanently lost.

**4.12.5 Content Privacy.** Your email messages and other items sent or received via the email service will include: (i) the content of the communication ("email content"), and (ii) certain information that is created by the systems and networks that are used to create and transmit the message (the "message routing data"). The email content includes things like the text of email messages and attached media files, and is generally the information that could be communicated using some media other than email (like a letter, telephone call, CD, DVD, etc.) The message routing data includes information such as server hostnames, IP addresses, timestamps, mail queue file identifiers, and spam filtering information, and is generally information that would not exist but for the fact that the communication was made via email. The email content of your items is your Confidential Information and is subject to the restrictions on use and disclosure described in these General Terms and Conditions. However, you agree that we may view and use the message routing data for our general business purposes, including maintaining and improving security, improving our services, and developing products. In addition, you agree that we may disclose message routing data to third parties in aggregate statistical form, provided that we do not include any information that could be used to identify you.

**4.12.6 Usage Data.** We collect and store information related to your use of the Cloud Services, such as use of SMTP, POP3, IMAP, and filtering choices and usage. You agree that we may use this information for our general business purposes and may disclose the information to third parties in aggregate statistical form, provided that we do not include any information that could be used to identify you.

**4.12.7 Email Campaigns & Relays.** The Cloud Services are limited to the following thresholds and obligations with regard to the distribution and/or forwarding of any bulk or commercial email: (i) any email originating from an exchange email client (e.g., OWA, Outlook, ActiveSync, etc) shall not be sent to  more than fifteen hundred (1,500) recipients per day from any individual email account unless otherwise agreed to in writing   by iCore; (ii) in the aggregate, neither you nor your organization are allowed to send more than two-hundred and fifty (250) email messages every twenty minutes; and (iii)  if you or your organization need to forward or relay any email message(s) from any third party application or system (scanners, accounting applications, salesforce.com, etc), you shall not forward or relay more than fifteen hundred (1,500) email messages on a daily basis and/or more than 500 email messages per hour.

**5. PROMISES WE DO NOT MAKE.**
**5.1** We do not promise that the Cloud Services will be uninterrupted, error-free, or completely secure.  You

acknowledge that there are risks inherent in Internet connectivity that could result in the loss of your privacy, Confidential Information, Content, and property.

**5.2 THE CLOUD SERVICES ARE PROVIDED "AS IS", "WHERE IS", "AS AVAILABLE" AND "WITH ALL FAULTS". EXCEPT AS EXPRESSLY STATED IN SECTION 3.2 ABOVE, WE AND OUR AFFILIATES AND LICENSORS MAKE NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, REGARDING THE CLOUD SERVICES OR ANY THIRD PARTY CONTENT, INCLUDING ANY WARRANTY THAT THE SERVICES OR THIRD PARTY CONTENT WILL BE UNINTERRUPTED, ERROR FREE, OR FREE OF HARMFUL COMPONENTS, OR THAT ANY CONTENT, INCLUDING YOUR CONTENT OR ANY THIRD PARTY CONTENT, WILL BE SECURE OR NOT OTHERWISE LOST OR DAMAGED. EXCEPT TO THE EXTENT PROHIBITED BY LAW OR OTHERWISE STATED IN SECTION 3.2 ABOVE, WE AND OUR AFFILIATES, SUPPLIERS, AND LICENSORS DISCLAIM ALL WARRANTIES, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, TITLE, RELIABILITY, OR QUIET ENJOYMENT, AND ANY WARRANTIES ARISING OUT OF ANY COURSE OF DEALING OR USAGE OF TRADE. ICORE DOES NOT WARRANT THAT THE SERVICES WILL MEET YOUR REQUIREMENTS, OR THAT THE OPERATION OF THE SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE, OR THAT DEFECTS IN THE SERVICES WILL BE CORRECTED, OR THAT ANY ENCRYPTION ALGORITHMS AND ANY OTHER SECURITY MEASURES WILL BE SECURE OR EFFECTIVE. YOU UNDERSTAND AND AGREE THAT NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY ICORE, ITS EMPLOYEE, AGENT, OR CONTRACTOR, SHALL CREATE ANY ADDITIONAL ICORE WARRANTIES OR IN ANY WAY INCREASE THE SCOPE OF ICORE'S OBLIGATIONS HEREUNDER.**

**THE SERVICES MAY BE USED TO ACCESS AND TRANSFER INFORMATION AND CONTENT OVER THE INTERNET. YOU ACKNOWLEDGE AND AGREE THAT ICORE DOES NOT OPERATE OR CONTROL THE INTERNET AND THAT (1) VIRUSES, WORMS, TROJAN HORSES AND OTHER UNDESIRABLE DATA OR SOFTWARE, OR (2) UNAUTHORIZED USERS (E.G., HACKERS) MAY ATTEMPT TO OBTAIN ACCESS TO AND DAMAGE YOUR CONTENT, DATA, WEBSITES, DEVICES AND NETWORKS. ICORE IS NOT RESPONSIBLE FOR SUCH ACTIVITIES. YOU ARE SOLELY RESPONSIBLE FOR THE SECURITY AND INTEGRITY OF YOUR ACCOUNT, YOUR CONTENT AND DATA, AND YOUR EQUIPMENT AND DEVICES. YOU ACKNOWLEDGE AND AGREE THAT ICORE SHALL HAVE NO LIABILITY ASSOCIATED WITH OR ARISING FROM YOUR FAILURE TO MAINTAIN ACCURATE CONTACT OR OTHER INFORMATION, INCLUDING, BUT NOT LIMITED TO, YOUR FAILURE TO RECEIVE CRITICAL INFORMATION ABOUT THE SERVICES.**

4

5.3 We will back up your data in accordance with the backup service you purchased as set forth in the Customer Service Order Agreement. If you purchase backup services, we do not promise to retain the data backup for longer than the agreed upon data retention period.

5.4 NO SUPPORT, ADVICE OR INFORMATION RELATING TO THE CLOUD SERVICES THAT YOU OBTAIN FROM iCORE OR FROM ANY THIRD PARTY, OR THAT YOU OBTAIN THROUGH THE CLOUD SERVICES, WILL CREATE ANY WARRANTY THAT IS NOT EXPRESSLY WRITTEN IN THIS AGREEMENT.

**6. UNAUTHORIZED ACCESS TO YOUR DATA OR USE OF THE SERVICES.** iCore is not responsible to you or any third party for unauthorized access to your Content or any Content stored on the Cloud Services or the unauthorized use of the Services. You are responsible for the use of the Services by any employee of yours or any End User, any person you authorize to use the Services, any person to whom you have given access to the Services, and any person who gains access to your Content or data or the Services as a result of your failure to use reasonable security precautions, even if such use was not authorized by you.

**7. PAYMENTS, BILLING DISPUTES, AND TAXES ON SERVICES.**
7.1 The calculation of all fees for Services will be based solely on our records and data. All computing overheads, including storage and bandwidth, will be included in the calculation of your fees. Fees for a particular server will begin to accrue when the server is associated with your Cloud Services account. You are solely responsible for all fees relating to servers and storage that are associated with your Cloud Services account and for any fees that you incur until they are deactivated. All iCore invoices are due upon receipt and all payments must be made in U.S. currency. Customer shall pay monthly recurring charges for any partial month during the Initial Term or any Renewal Term on a pro rata basis. In addition to the Services charges, you shall also pay all applicable taxes and any third party charges (e.g., installation, local access). Any amount not received by iCore within thirty (30) days of the date of the iCore invoice will be subject to interest at the lesser of 1 1/2% per month or the highest rate permitted by applicable law plus any attorneys' fees and costs incurred by iCore in collecting any such amounts. Billing for each of the Services shall commence on the Billing Commencement Date. Except as otherwise set forth in the applicable Customer Service Order Agreement, (a) monthly recurring charges ("MRCs") will be billed monthly in advance, (b) varying or usage-based charges will be billed monthly in arrears and (c) installation or other non-recurring charges will be billed upon the Billing Commencement Date. If iCore is unable to deliver the Services on time due to the delay of you or your End User, customer, contractor, and/ or agent, iCore may commence billing as of the date the Services would have been ready for delivery but for such delay. iCore will not change the Services rates during the Initial Services Term Commitment specified in the Customer Service Order Agreement. The foregoing shall not limit iCore's right to increase charges: (i) as set forth in a Customer Service Order Agreement; or (ii) during any Renewal Term.

7.2 If you believe that you have been charged in error, or if you believe that you are due a credit or refund in accordance with the terms of this Agreement, you must notify iCore in writing within thirty (30) days after delivery of iCore's invoice. Any billing disputes must be in writing, using the iCore Credit Request Form, and include a detailed statement describing the nature and amount of the disputed charge(s) and the reason(s) why a credit or refund is being requested, and sent via certified or overnight mail, return receipt requested, to the attention of:

> Billing Department
> iCore Networks, Inc.
> 7900 Westpark Drive, Suite A-315
> McLean, Virginia 22102

You shall cooperate fully with iCore to promptly address and attempt to resolve the disputed charge(s). If you fail to provide written notice of dispute within the enumerated thirty (30) day deadline, the charges and invoice will be conclusively deemed correct and binding on you. Irrespective of the foregoing, you shall pay the full amount of the invoice, including the disputed amounts in a timely manner and in accordance with the payment terms set forth in this Agreement.

7.3 You agree to pay all taxes on the Cloud Services that we are required by law to collect, including transaction, local, value-added, sales, and service taxes. All fees charged by iCore are exclusive of any such taxes, duties, levies or fees. In no event will you be responsible for any taxes on our income. If you are exempt from paying taxes on the Cloud Services, you agree to promptly provide us with reasonable written proof of your tax exempt status.

7.4 If iCore determines, prior to providing you with access to any Cloud Service, or during the term of this Agreement or any Customer Service Order Agreement, that it requires a deposit to ensure your timely payment, you may be required to provide a security deposit. If iCore requires a security deposit, the deposit will be held and applied as required by law. iCore may apply the deposit to past due obligations as well as to any fees or other assessments to your account.

**8. EXPORT MATTERS.** You represent and warrant that you are not on the United States Department of Treasury, Office of Foreign Asset Controls list of Specially Designated National and Blocked Persons and are not otherwise a person to whom iCore is legally prohibited from providing the Services. You may not use the Services for the development, design, manufacture, production, stockpiling, or use of nuclear, chemical or biological weapons, weapons of mass destruction, or missiles or as otherwise prohibited by law, nor may you provide administrative access to the Services to any person (including any natural person or government or private entity) that is located in or is a national of any country that is embargoed or highly restricted under applicable United States export regulations.

**9. CHANGES TO THE SERVICES AND ACCEPTABLE USE POLICY.**
9.1 We may change, discontinue, or deprecate any of the Services (including the Services as a whole) or change or remove features or functionality of the Services from time

5

to time in our sole discretion. We will notify you of any material change to or discontinuation of the Services.

9.2 We may change the AUP to add or modify restrictions on our customers' use of the Services, provided that the changes are reasonable and consistent with hosting industry norms. If we make a change to the AUP, we will publish a revised version of the AUP at www.icore.com.

9.3 If your compliance with the revised AUP would adversely affect your use of the Cloud Services, and you give us written notice of your objection no later than thirty (30) days following the date that the revised AUP takes effect, we will not enforce the revision as to you until forty-five (45) days following the date the revision would otherwise have become effective as to you and you will continue to be subject to the prior version of the AUP. During the forty-five (45) day period, you may elect to terminate the Agreement on these grounds by giving written notice to iCore. We will not charge you an early termination fee for a termination on these grounds. If you do not elect to terminate your use of the Services during the forty-five (45) day period, then the revised AUP will become effective as to you as of the end of the forty-five (45) day period. If you terminate your Services under this Section, we may decide to waive that AUP change as to you and keep your Agreement in place for the remainder of the Services Term Commitment or Renewal Term then in effect.

## 10. SUSPENSION OF SERVICES.

10.1 We may suspend your or any End User's right to access or use any portion or all of the Services immediately and without liability upon notice to you if: (i) we reasonably believe that the Services are being used in violation of the Agreement or you are in violation of the Agreement including if you are delinquent on your payment obligations; (ii) you do not cooperate with our reasonable investigation of any suspected violation of the Agreement; (iii) there is an attack on the Hosted System or the Hosted System is accessed or manipulated by a third party without your consent, (iv) we are required by law to suspend your Services, (v) your or an End User's use of the Services (a) poses a security risk to the Services or any third party, (b) may adversely impact the Services or the systems or content of any other iCore customer, (c) may subject us, our affiliates, or any third party to liability, or (d) may be fraudulent; (v) you or any End User use the Services in a manner that results in excessive bandwidth usage, as determined by iCore,(vi) you or an End User use the Services for any illegal purpose, or to store, backup or distribute any illegal files or data, (vii) you or an End User use the Services to store, backup or distribute material or content protected by intellectual property rights of a third party unless you own or have rights to such material or content; (viii) you or an End User use the Services to store, backup or distribute material that contains viruses, Trojan horses, worms, corrupted files or any other similar software that may damage the operation of the Services or another person's or entity's equipment or property, (ix) you or an End User directly or indirectly reverse engineer, decompile, disassemble, modify, reproduce or create derivative works of the Services, (x) you or an End User alter or modify any disabling mechanism which may be included in the Services, (xi) you assign, sublicense, rent, timeshare, loan, lease or otherwise transfer the Services, (xii) you remove or alter any proprietary notices (e.g., copyright, trademark notices, legends, etc.) from the Services; or (xiii) there is another event for which we reasonably believe that the suspension of Services is necessary to protect the iCore network or Services, the Hosted System, and/ or our other customers. If your Hosted System is compromised, then you must address the vulnerability prior to iCore placing the Hosted System back in service or, at your request, we may be able to perform this work for you at our standard hourly rates as a Supplementary Service.

10.2 Effect of Suspension. If we suspend your right to access or use any portion or all of the Services: (a) you remain responsible for all fees and charges you have incurred through the date of suspension plus all applicable MRCs during the suspension period; and (b) you remain responsible for any applicable fees and charges for any Services to which you continue to have access, as well as applicable data storage fees and charges, and fees and charges for in-process tasks completed after the date of suspension.

## 11. TERMINATION

11.1 Early Termination. If this Agreement is terminated by you prior to the expiration of the Initial Term or any Renewal Term and such termination is not due to iCore's uncured breach as set forth in Section 11.2 below or if iCore terminates this Agreement pursuant to Section 11.2 or Section 11.3 below due to your uncured breach, you shall pay to iCore: (a) an early termination charge, which you agree is reasonable, equal to all non-recurring and monthly recurring charges for Cloud Services as set forth in the Customer Service Order Agreement which would otherwise be due through the end of the Initial Term or Renewal Term and in effect at the time, including all applicable taxes and fees; (B) for all Services charges accrued but unpaid as of the termination date; and (c) any out-of-pocket expenses incurred by iCore or imposed on iCore (e.g., ordered and non-cancellable equipment, licenses, termination charges). For avoidance of doubt, you agree and acknowledge that the foregoing early termination charges shall apply even if you terminate the Agreement and/or any Customer Service Order Agreement prior to the Billing Commencement Date. The parties agree that the precise damages resulting from an early termination by you or termination by iCore due to your breach are difficult to ascertain and the early termination charges set forth in this Section 11.1 is a reasonable estimate of anticipated actual damages and not a penalty. The early termination charges shall be due and payable within ten (10) days of the effective date of termination.

11.2 Termination for Breach. We may also terminate this Agreement for breach if: (i) we discover that the information you provided for the purpose of subscribing to or using the Services is materially inaccurate or incomplete and you fail to provide accurate and complete information within five (5) business days of receipt of written notice from us, (ii) we determine, in our sole discretion, that your use of the Cloud Services poses a threat to the security or performance of our network, the Services, or to any of our customers or suppliers; (iii) we determine, in our sole discretion, that your use of the Cloud Services is illegal, or that it misappropriates or infringes the property rights of a third party; (iv) we reasonably believe that your use of the Cloud Services has or will subject iCore to civil or criminal

6

liability; (v) you fail to make any payment when due or if your credit card is declined and you do not pay the overdue amount within five (5) Business Days of receipt of our written notice; or (vi) you use cloud resources in an attempt to gain unauthorized access to computer systems (i.e., "hacking"). We may also terminate the Agreement for breach if you violate the AUP more than once even if you cure each violation, or if your agreement for any other ICore service is terminated for breach of the acceptable use policy applicable to that service.

**11.3** In addition to our right to suspend or terminate the Cloud Services in accordance with this Agreement , we may suspend all or part of the Cloud Services without liability or prior notice to you (i) in order to maintain (i.e., modify, upgrade, patch, or repair) our infrastructure or any Cloud servers; (ii) as we determine may be required by law or regulation; or (iii) as we determine to be necessary to protect our infrastructure and customers from unauthorized access or an attack on the Cloud Services. Notwithstanding the foregoing, we will endeavor in good faith to provide you with advance notice of any suspension or termination under this Section and we will provide you with notice of the suspension or termination as soon as it becomes practicable for us to do so.

**11.4** Upon any termination of this Agreement: (i) all your rights under this Agreement immediately terminate; (ii) you remain responsible for all fees and charges you have incurred through the date of termination, including fees and charges for in-process tasks completed after the date of termination; (iii) you will immediately return or, if instructed by us, destroy all ICore Confidential Information in your possession or control; and (iii) during the thirty (30) day period after the expiration or termination of the Agreement, we will provide you with post-termination Content retrieval assistance only upon a written agreement for Supplementary Services signed by you and us and your prepayment of the applicable fees agreed upon in such written agreement for Supplementary Services. You agree and acknowledge that, effective thirty (30) days after the expiration or termination of the Agreement for any reason, ICore has the right, without liability or further obligation, to permanently erase all Content and data stored on the ICore Cloud Services and Infrastructure.

**12.  CONFIDENTIAL INFORMATION.** Each of us agrees not to use the other's Confidential Information except in connection with the provision, performance or use of the Services, as applicable, the exercise of our respective legal rights under the Agreement, or as may be required by law. Each of us agrees not to disclose the other's Confidential Information to any third person except as follows:  (i) to each of our respective service providers, contractors, agents, and representatives on a need to know basis, provided that such service providers, contractors, agents and representatives agree in writing to confidentiality measures that are at least as stringent as those stated in these General Terms and Conditions; (ii) to a law enforcement or government agency if required, or if either of us reasonably believes that the other's conduct may violate applicable criminal law; (iii) as required by law; or (iv) in response to a subpoena or other compulsory legal process, provided that, if permissible to do so, each party agrees to give the other party prompt written notice prior to disclosing Confidential Information under this subsection, unless the law forbids such notice.

The receiving party acknowledges that disclosure of the disclosing party's Confidential Information could cause substantial harm to the disclosing party for which damages alone might not be a sufficient remedy and, therefore, that, upon any actual or threatened disclosure by the receiving party of the disclosing party's Confidential Information, the disclosing party shall be entitled to appropriate equitable relief in addition to whatever other remedies it might have at law.

**13.  LIMITATION OF LIABILITY.**
**13.1** The credits stated in the applicable Service Level Agreement are your sole and exclusive remedy for our failure to provide Services in accordance with the Agreement unless such failure is due to ICore's willful misconduct, gross negligence, or violation of law.

**13.2 EXCEPT FOR A PARTY'S INDEMNIFICATION OBLIGATIIONS UNDER THSI AGREEMENT, NEITHER YOU NOR US (NOR ANY OF OUR EMPLOYEES, AGENTS, AFFILIATES, SUPPLIERS, LICENSORS, OR CONTRACTORS) WILL NOT BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, OR EXEMPLARY DAMAGES, INCLUDING DAMAGES FOR LOSS OF PROFITS, GOODWILL, USE, OR DATA, EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. FURTHER, NEITHER WE NOR ANY OF OUR EMPLOYEES, AGENTS, AFFILIATES, SUPPLIERS, LICENSORS, OR CONTRACTORS WILL BE RESPONSIBLE OR LIABLE FOR ANY COMPENSATION, REIMBURSEMENT, OR DAMAGES ARISING IN CONNECTION WITH: (A) YOUR INABILITY TO USE THE SERVICES, INCLUDING AS A RESULT OF ANY (I) TERMINATION OR SUSPENSION OF THIS AGREEMENT OR YOUR USE OF OR ACCESS TO THE SERVICES, (II) OUR DISCONTINUATION OF ANY OR ALL OF THE SERVICES, OR (III) WITHOUT LIMITING ANY OBLIGATIONS UNDER ANY APPLICABLE SERVICE LEVEL AGREEMENT, ANY UNANTICIPATED OR UNSCHEDULED DOWNTIME OF ALL OR A PORTION OF THE SERVICES FOR ANY REASON, INCLUDING AS A RESULT OF POWER OUTAGES, SYSTEM FAILURES, OR OTHER INTERRUPTIONS; (B) THE COST OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES; (C) ANY INVESTMENTS, EXPENDITURES, OR COMMITMENTS BY YOU IN CONNECTION WITH THIS AGREEMENT OR YOUR USE OF OR ACCESS TO THE SERVICES; OR (D) ANY UNAUTHORIZED ACCESS TO, ALTERATION OF, OR THE DELETION, DESTRUCTION, DAMAGE, LOSS OR FAILURE TO STORE, ANY OF YOUR CONTENT OR OTHER DATA. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, EXCEPT FOR LIABILITY BASED ON OUR GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AND OUR LIABILITY FOR DEATH OR PERSONAL INJURY RESULTING DIRECTLY FROM OUR GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, THE MAXIMUM AGGREGATE LIABILITY OF ICORE AND ANY OF ICORE'S EMPLOYEES, AGENTS, SUPPLIERS, CONTRACTORS, LICENSORS, AND AFFILIATES IN CONNECTION WITH OR RELATED TO THE SERVICES AND/OR THIS AGREEMENT, UNDER ANY THEORY OF LAW (INCLUDING BREACH OF CONTRACT, TORT, STRICT LIABILITY, VIOLATION OF LAW, AND INFRINGEMENT), SHALL NOT EXCEED THE TOTAL**

7

AMOUNT OF MONTHLY RECURRING CHARGES YOU ACTUALLY PAID TO US FOR THE CLOUD SERVICES DURING THE THREE (3) MONTH PERIOD IMMEDIATELY PRECEDING THE MONTH IN WHICH THE CLAIM FOR DAMAGES FIRST AROSE. YOU EXPRESSLY RECOGNIZE AND ACKNOWLEDGE THAT THE FOREGOING LIMITATION OF LIABILITY IS AN ESSENTIAL PART OF THIS AGREEMENT AND ICORE'S WILLINGNESS TO PROVIDE YOU THE SERVICES, AND IS AN ESSENTIAL FACTOR IN ESTABLISHING THE PRICE OF THE SERVICES. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO SOME OF THE FOREGOING TERMS MAY NOT APPLY TO YOU IN THOSE JURISDICTIONS AS APPLICABLE.

**14. INDEMNIFICATION.**

**14.1** You will defend, indemnify, and hold harmless us, our affiliates, contractors, and licensors, and each of their respective employees, officers, directors, and representatives from and against any claim, damage, loss, liability, cost, and expense (including reasonable attorneys' fees) arising out of or relating to any third party claim concerning: (a) your or any End User's use of the Services (including any activities under your iCore account and use by your employees, agents, contractors, and personnel); (b) your or any End User's negligence, willful misconduct, breach of this Agreement, or the violation of any applicable law by you or any End User; (c) your Content or the combination of your Content with other applications, content, or processes, including any claim involving alleged infringement, or misappropriation of third party rights by your Content or by the use, development, design, production, advertising or marketing of your Content; (d) a dispute between you and any End User or customer; and (e) your relationship with the manufacturer, licensor, or distributor of any software installed or stored on the Cloud Services. Your obligations under this Section also include all claims arising out of the act, error, or omission of any of your employees, contractors, agents, and any other person to whom you have given access to the Services, and any person who gains access to the Services as a result of your failure to use reasonable security precautions and measures, even if the act, error, or omission of such person was not authorized by you. If we or any of our affiliates are obligated to respond to a third party subpoena or other compulsory legal order or process described above, you will also reimburse us for reasonable attorneys' fees and expenses, as well as our employees' and contractors' time and materials spent responding to the third party subpoena or other compulsory legal order or process at our then-current hourly rates. You must pay expenses due under this Section as we incur them.

**14.2. Process.** We will promptly notify you of any claim subject to Section 14.1, but our failure to promptly notify you will only affect your obligations under Section 14.1 to the extent that our failure prejudices your ability to defend the claim. You may: (a) use counsel of your own choosing to defend against any such claim; and (b) settle the claim as you deem appropriate, provided that you obtain our prior written consent before entering into any settlement, which consent shall not be unreasonably delayed or denied.

**15. PUBLICITY.** You agree that we may publicly disclose that we are providing Services to you and may use your name and logo to identify you as our customer in promotional materials, including press releases. We will not use your name or logo in a manner that suggests an endorsement or affiliation.

**16. SOFTWARE**

**16.1 General.** You may not copy any software we provide for your use unless expressly permitted by the Agreement. You may not remove, modify or obscure any copyright, trademark or other proprietary rights notices that appear on any software or documentation we provide for your use. Unless permitted by the terms of an open source software license, you may not reverse engineer, decompile or disassemble any software we provide for your use except and to the extent that you are expressly permitted by applicable law to do this, and then following at least ten (10) days advance written notice to us. If you use any non-iCore provided software on your Hosted System, you represent and warrant to iCore that you have the legal right to use the software in that manner. On iCore's written request, you will certify in writing that you are in compliance with the requirements of this paragraph and any other software license restrictions that are part of the Agreement, and will provide evidence of your compliance as we may reasonably request.

**16.2 Customer Provided Licenses.** If iCore has agreed to install, patch or otherwise manage software in reliance on your license with a software vendor or any third party (rather than iCore's license with the software vendor), then you represent and warrant that you have a written license agreement with the vendor or third party that permits iCore to perform these activities. You agree that you will provide iCore with evidence of licensing as iCore may reasonably require prior to the scheduled deployment date, and from time to time as necessary to update the status of the license. If you fail to provide the required evidence of licensing iCore may, at its option, either (i) delay the deployment date for the Hosted System that was to include such software until the evidence is provided, (ii) deploy the Hosted System in reliance on iCore's licensing agreement with the vendor, and charge you its standard fee for the use of the software until such time as the required evidence is provided, or (iii) suspend or terminate this Agreement. Please Note: Your licensed software may not be compatible with iCore's standard process for deploying and repairing the Hosted System. In addition, in order to install the software, iCore may require you to send the physical or electronic media provided to you by the vendor, both for deployment and again in the event of a failure of your Hosted System. You agree that iCore will not be in breach of any Service Level Agreement or other obligation under this Agreement that would not have occurred but for a delay resulting from our agreement to use your licensed software.

**17. RECOMMENDATIONS.** iCore personnel may from time to time recommend third party software or other products and services for your consideration. ICORE MAKES NO REPRESENTATION OR WARRANTY WHATSOEVER REGARDING PRODUCTS AND SERVICES THAT ARE NOT PURCHASED FROM ICORE. Your use of any such products and/or services is governed by the terms of your agreement with the provider of those products and services.

8

**18. WHO MAY USE THE SERVICE.** You may permit your subsidiaries and affiliated companies to use the Services if you wish. ICore will provide support only to you, not to your customers, subsidiaries or affiliates. There are no third party beneficiaries to the Agreement, meaning that your End Users, customers, subsidiaries, affiliates, agents, contractors, and all other third parties do not have any rights against ICore or you under this Agreement.

**19. SERVICES MANAGEMENT AGENT.** You agree that you will not interfere with any services management software agent(s) that ICore installs on your Hosted System or the Cloud Services. ICore agrees that its agents will use only a minimal amount of computing resources, and will not interfere with your use of your Hosted System. ICore will use the agents to track system information so that it can more efficiently manage various service issues, such as patching exceptions and product life cycles. ICore may also use the agents to identify security vulnerabilities. ICore will not use the agents to view or capture your Content or data. You shall not disable or interfere with our services management software agent(s).

**20. NOTICES.** Your routine communications regarding the Services (e.g., Services issues, Services questions) should be sent to your ICore account team via email or by calling the ICore toll-free customer support number. If either party wants to give any type of legal notice (e.g., notice of overdue payment, notice of non-renewal, notice of deficiency with any of the Services, termination of the Agreement for breach, suspension of any of the Services, indemnification, or other legal matter), any such notice must be in writing and sent by registered or certified mail, return receipt request, or by overnight courier service, pursuant with the requirements of the General Terms.

**21. OWNERSHIP OF INTELLECTUAL PROPERTY.** Except for the specific rights provided in these General Terms and Conditions, this Agreement does not convey to either of us any ownership right or license to use, sell, exploit, copy or further develop the other party's Confidential Information or intellectual property, including patents, copyrights, trademarks, trade names and trade secrets. Each of us retains all right, title and interest in and to our respective trade secrets, inventions, copyrights, and other intellectual property. You acknowledge that ICore or its licensors or vendors own all right, title and interest in and to the Cloud Services, all copies thereof, and all proprietary rights therein, including copyrights, patents, trademarks, logos, domain names, or other brand features of ICore. Any intellectual property developed by ICore during the performance or provision of the Services shall belong to ICore. The Cloud Services may include various utility and deployment scripts, customizations to templates, code extending the functionality of third party applications licensed to us, printed and electronic documentation, and other data that we have or may develop at our own expense before and while the Agreement is in effect (the "ICore Content"). Subject to your compliance with this Agreement, we grant to you a limited, revocable, non-exclusive, non-transferable, non-assignable, worldwide, royalty-free license to use ICore Content while the Agreement is in effect solely to access and use the Cloud Services in accordance with the terms and conditions of this Agreement. You may not translate, reverse engineer, decompile, disassemble, rent, lease, assign, transfer, redistribute, or sublicense any ICore Content.

**22. OWNERSHIP OF OTHER PROPERTY.** You do not acquire any ownership interest in or right to possess the Hosted System or any of the Cloud Services, and you have no right of physical access to the Hosted System. We do not acquire any ownership interest in or right to the Content you transmit to or from or store on the Cloud Services, any ICore servers, or other devices or media.

**23. INTELLECTUAL PROPERTY INFRINGEMENT.** If ICore or any of its customers is faced with a credible claim that any portion, component, or element of the Services infringe the intellectual property rights of a third party, and ICore is not reasonably able to obtain the right to use the infringing element or modify the Services such that they do not infringe, then ICore may, in its sole discretion, terminate the Services on reasonable written notice of at least ten (10) Business Days, and will not have any liability on account of such termination except to refund amounts prepaid by you for Services not received as of the time of termination.

**24. ASSIGNMENT/SUBCONTRACTORS.** Neither party may assign the Agreement without the prior written consent of the other party except as part of a bona fide corporate reorganization, assignment to an affiliate, or a sale of its business or all or substantially all of its assets provided that the assignee agrees in writing to comply with all terms and conditions of the Agreement. ICore may use third party service providers and contractors to perform and/or provide all or any part of the Services, but ICore remains responsible to you under this Agreement for Services performed and/or provided by its third party service providers to the same extent as if ICore performed the Services itself. Any subcontractor will be deemed to be an independent contractor and not our partner, agent, or employee. We may collect and report information regarding your use of the Cloud Services to our subcontractors, licensors or suppliers as required to provide you with the Cloud Services.

**25. FORCE MAJEURE.** See General Terms.

**26. GOVERNING LAW, LAWSUITS.** See General Terms.

**27. GOVERNMENT RIGHTS.** With respect to the procurement of any Cloud Services by or for the U.S. Government, any software provided in connection with the Cloud Services is deemed to be "commercial computer software" as defined in the FAR and DFARS. The Government will receive no greater than restricted rights as provided in FAR 52.227-14, FAR 52.227-19(c)(1)-(2) (Jun. 1987), DFAR 252.227-7013(c)(1)(ii) (Oct. 1988), DFAR 252.221-7015(c) (May 1991), DFAR 252.227-7014, or DFAR 252.227-7018, as applicable or amended. In addition, the Government will receive no greater than limited rights as provided in FAR 52.227-14, DFAR 252.227-7015, DFAR 252.227-7018, or DFAR 252.227-7013, as applicable or amended. All computer software and technical data were developed exclusively at private expense by ICore or its third-party licensors or suppliers. The use of all computer software, documentation, and technical data is further restricted in accordance with the terms of the Agreement.

9

## 28. SOME AGREEMENT MECHANICS.

28.1 Unless otherwise expressly permitted in this Agreement, the General Terms and Conditions and Customer Service Order Agreement and any addenda referenced in any of them, may be amended only by a formal written agreement signed by both parties. A Customer Service Order Agreement may be amended to modify, add, or remove Services, by a formal written agreement signed by both parties, or by an exchange of correspondence, including via electronic mail, which includes the express consent of an authorized individual for each of us. Any pre-printed terms on your purchase order or any other business form will not become part of the Agreement.

28.2 If there is a conflict between the terms of any of the documents that comprise this Agreement, the documents will govern in the following order: the General Terms and Conditions, Customer Service Order Agreement, and the Acceptable Use Policy. To the extent there is any conflict between the iCore Universal Terms incorporated into any Customer Service Order Agreement and these General Terms and Conditions, these General Terms and Conditions shall apply and prevail. If any part of this Agreement is found unenforceable by a court, the rest of the Agreement will nonetheless continue in full force and effect, and the unenforceable part shall be reformed to the extent possible to make it enforceable but still consistent with the business and financial objectives of the parties. Each party may enforce each of its respective rights under the Agreement even if it has waived the right or failed to enforce the same or other rights in the past. The relationship between the parties is that of independent contractors and not business partners. Neither party is the agent for the other party nor has the right to bind the other party in any agreement with a third party. This Agreement and any transaction under it do not create an agency, joint venture, or partnership between us and you. We do not have a landlord-tenant relationship with you, and we are not your bailee or warehouseman with respect to any data or Content. You have no right to access our premises or data centers and no right to possess or own any IP address, software, server hardware or other equipment included in the Cloud Services. The parties affirm that there are no side agreements or any representations or warranties other than those set forth in this Agreement. The paragraph headings herein are for convenience only and shall not limit in any way the scope, meaning, or interpretation of any provision of this Agreement. This Agreement will be construed and interpreted in a neutral manner. Should any provision of this Agreement require interpretation or construction, the parties agree that this Agreement will be interpreted or construed without any presumption that the provisions of this Agreement are to be construed against the party who prepared this Agreement. The use of the word "including" in the Agreement shall be read to mean "including without limitation." The words "our" and "us" refer to iCore, unless the context clearly indicates another meaning. The Agreement is effective when you sign it, even though the "initial term" may be defined in the Agreement with reference to the Service Commencement Date or other date. The following provisions shall survive expiration or termination of the Agreement: (i) Sections 1, 2, 3, 4, 5, 6, 7, 11, 12, 13, 14, 16, 20, 21, 22, 23, 24, 25, 26, 27, and 28 of this General Terms and Conditions, (ii) all provisions in the Agreement requiring you to pay fees for Services provided prior to the time of expiration or termination or requiring you to pay an early termination fee, and (iii) all other provisions of the Agreement that by their nature are intended to survive expiration or termination of the Agreement.

28.3 The Agreement may be signed in multiple counterparts, which taken together will be considered one original. Facsimile signatures, signatures on an electronic image (such as .pdf or .jpg format), and electronic signatures shall be deemed to be original signatures.

**This Agreement is the complete and exclusive agreement between you and iCore regarding its subject matter and supersedes and replaces any prior agreement, understanding or communication, written or oral.**

10

**EXHIBIT B**

## iCore Networks, Inc. Information Technology Support Services Agreement

This Information Technology Support Services Agreement (the "Agreement") is entered into by and between iCore Networks, Inc. ("Company") and the customer listed on the Order Form ("Client"). The Agreement is effective as of the last date the Order Form is executed between Company and Client (the "Effective Date").

**1. Definitions.** As used in the Agreement, the following terms will be defined as follows:

**1.1 "Covered Services"** means the network, consulting, and other information technology support services provided by Company under this Agreement in one or more packaged, fixed-fee offerings, as described in one or more Order Forms signed by the parties.

**1.2 "Excluded Services"** means information technology services and any related support services Company provides (i) to respond to and remedy problems caused by Client's failure to comply with its obligations under this Agreement, including, without limitation, its failure to comply with the obligations specified in Section 3.1 below; or (ii) that are outside the scope of and not included within, any Covered Services or Project Services (as defined below) purchased by Client under this Agreement. Client agrees to pay for Excluded Services on a time and materials basis.

**1.3 "Order Form"** means a document in a format specified by Company under which Client orders Covered Services. Each Order Form will incorporate this Agreement by reference and must be signed by both parties.

**1.4 "Project"** means consulting or information technology support services provided by Company that typically require advance planning or the creation of testing scenarios or project plans. Projects may arise at Client's request or for a variety of other reasons including, without limitation, any one of the following: (i) the addition of a new server or the replacement of an existing server, (ii) the addition of a new remote office for Client and/or the hiring of additional employees, (iii) a change in Client's Internet Service Provider/IP address, (iv) the rollout of a new third party software product to some or all of Client's personnel, (v) changes to Client's email or other infrastructure, (vi) moving Client's servers or other network hardware to a co-located facility, or (vii) other Services provided by Company in addition to the Covered Services. Company will provide Client good faith estimates for all Projects contemplated by the parties. The parties will negotiate in good faith and sign a Statement of Work describing the Services to be provided by Company in connection with a Project ("Project Services"). Unless otherwise specified in the applicable Statement of Work, Client agrees to pay for Projects on a time and materials basis.

**1.5 "Services"** means, collectively or individually, one or more Covered Services, Excluded Services, and Project Services.

**1.6 "Statement of Work"** means a document provided by Company that describes specific Project Services which Company will provide to Client, as well as the associated fees, schedule, and any Work Product the parties anticipate will result from such Services. Each Statement of Work will incorporate, and is subject to, this Agreement and must signed by both parties.

**1.7 "Work Product"** means written reports, analyses, or other working papers developed by Company specifically at the request of Client and described in a Statement of Work signed by both parties.

**2. Company's Responsibilities.**

**2.1 Provision of the Services.** Upon signature of an Order Form or Statement of Work by both parties and in consideration of and subject to Client's timely payment of all fees due and payable with regard to the Services, Company agrees to provide the Services described in the Order Form or Statement of Work, as applicable. Company will use commercially reasonable efforts to provide all Services in a timely manner in accordance with the relevant Order Form or Statement of Work. Subject to the terms of this Agreement, Company will work with Client's personnel, subcontractors, and/or vendors when necessary to address technical issues, and will escalate issues as necessary in its efforts to achieve timely resolution.

**2.2 Company Personnel.** Company will provide the Services using trained, competent, and professional staff. When working at one of Client's locations, Company's personnel will comply with Client's reasonable site security policies that are provided in writing to Company in advance. Company will use its own employees for all assigned work, except where Company determines that subcontracted personnel will provide Services in accordance with any given assignments. In such situations, Company may use the services of subcontractors for the provision of any Services under this Agreement; provided, however, Company will be responsible for each subcontractor's performance of Services under this Agreement and for each subcontractor's compliance with the terms and conditions of this Agreement.

**2.3 Right to Make Decisions.** Subject to the terms and conditions of this Agreement, as well as the Order Forms and Statements of Work signed by both parties, Company will have the right, in its sole and reasonable discretion, to make all decisions with respect to the method, details, and means of performing the Services provided to Client, as well as the appropriate method of charging for Services. Without limiting the generality of the preceding sentence, Company's decisions may include, without limitation, determining: (i) when an on-site visit to Client's location is necessary and when remote support will be sufficient; (ii) whether particular Services to be provided by Company constitute Covered Services, Excluded Services, or should be provided as a Project; (iii) whether a Project proposed or requested by Client is appropriate and/or commercially feasible at the time Client proposes or requests the Project; and (iv) the severity level of a problem reported by Client and the corresponding response time and escalation process. Company will promptly notify Client of each decision and work in good faith to address and attempt to resolve any concerns Client may have regarding such decisions.

**2.4 Right to Make Changes.** Company reserves the right to change the Covered Services or other professional services it offers to its customers generally and the related rates at any time. Any such changes, however, will not apply to any Order Forms or Statements of Work signed by the parties before the date Company releases such changes, unless the parties agree otherwise in a fully executed amendment to such Order Forms or Statements of Work, as applicable.

3. **Client's Responsibilities.**

**3.1 Client's Obligations with Respect to the Services.** Client acknowledges and agrees that Company's pricing for the Covered Services and its willingness to offer such Services in the packages described in an Order Form are based upon and subject to Client's performance of its obligations under this Agreement, including those set forth in this Section 3.1. Accordingly, Client hereby agrees that it shall comply will all of the following:

(a) Pay all fees due and payable under the Agreement in a timely manner. If Client fails to pay any fees when due and fails to cure such breach within ten (10) business days of receiving notice of such failure from Company, then, in addition to its other rights available under this Agreement, including under Section 11.3 below, and other remedies available at law or in equity, Company will have the right to suspend performance of the Services for which such fees are payable until Client fully pays all amounts due.

(b) Provide a safe working environment for Company's personnel and contractors while they are on site at Client's location(s).

(c) Provide a primary point of contact through whom Company will communicate decisions and who will have the authority to make decisions related to the Services on behalf of Client.

(d) Provide full and timely access to Client's facilities, network, equipment and hardware,, software applications, and environment, as well as to any employees or contractors that have technical information, passwords, or other information needed by Company to provide the Services, as well as skilled and knowledgeable Client personnel to assist in performing any joint efforts.

(e) Comply in a timely manner with all reasonable requests and recommendations made by Company in the course of providing Services under this Agreement, provided that Company adheres to industry standards in making such requests and recommendations. Such recommendations may include the replacement or upgrade of one or more servers, other hardware or third party software products and applications, and the addition of new hardware or software products and applications.

(f) Not use another information technology consulting company or service provider during the Term of this Agreement (as defined in Section 11.1 below) unless Client first notifies Company and obtains Company's written consent.

(g) Ensure that all of its network and infrastructure equipment and software, including servers, PCs, routers, firewalls, switches, operating systems, anti-virus software, critical third party applications, and other similar items (collectively, its "**IT Infrastructure**") meet the minimum specifications designated by Company, which Company may update from time to time.

(h) Not allow its employees, contractors, or any third party to make any configuration or other changes to any component of Client's IT Infrastructure without first informing Company and obtaining its written approval.

(i) Not to deploy more than the number of licenses Client has purchased for any third party software product, and not use any pirated or unlicensed software at any Client location or use any software in an unauthorized manner. Company will have the right to refuse to provide any Services or other support with respect to pirated or unlicensed software used by Client.

(j) Consult with Company before purchasing any new equipment or software for its IT Infrastructure.

(k) Implement and maintain information technology and security policies and procedures that are consistent with industry best practices and are acceptable to Company. Promptly following the execution of this Agreement, Client will provide copies of its then-current policies to Company for review and approval; provided, however, that Client will ultimately be responsible for approving, implementing, maintaining, and enforcing all of its company policies.

(l) Remain current with technical support agreements, maintenance agreements, and manufacturer extended warranties for all components of Client's IT Infrastructure.

(m) Ensure that all communications with Company are timely and are directed only to the Help Desk telephone number, support email address, or, if made available by Company, the web portal Company provides to Client as well as Client's dedicated iCore Account Manager.

**3.2 Failure to Comply.** In addition to other remedies available at law or in equity, if Client fails to comply with its obligations listed in Section 3.1 above, any Services which Company provides in response to, or to remedy problems caused by, such failure will be treated as Excluded Services and charged on a time and materials basis.

**3.3 Non-solicitation.** During the Term of this Agreement or while Company is otherwise providing any Services to Client, and for a period of one (1) year thereafter, Client shall not, directly or indirectly, for its own benefit or for, with or through any other person, firm, corporation, or other entity solicit or attempt to solicit any employee or subcontractor of Company to end his or her employment or business relationship with Company or to work in any capacity for any person or entity other than Company; or (ii) attempt to hire, employ, or associate in business with any person employed by Company or who has left the employment of Company within the preceding six (6) months or discuss any potential employment or business association with such person. If Client breaches this provision, it shall promptly pay to Company, as liquidated damages and not as a penalty, an amount equal to the employee's or subcontractor's total annual compensation amount based on the annualized run rate which was in effect immediately before the termination of his or her employment or engagement with Company.

4. **Changes to Covered Services.**

**4.1 Addition of Services.** At any time during the term of an Order Form signed by both parties, Client will have the right to ask that Company provide the Covered Services specified in the Order Form or Statement of Work to support more servers, PCs, or any other IT Infrastructure than the numbers and/or scope specified in the signed Order Form or Statement of Work. The parties will amend the applicable Order Form or Statement of Work to add the new servers, PCs, or any other IT Infrastructure to the Order Form or Statement of Work and to reflect the additional fees Client will pay for the additional Covered Services. Unless the parties otherwise agree in writing, the amendment will not affect the original term of the Order Form or Statement of Work.

**4.2 Upgrade of Covered Services.** At any time during the term of an Order Form signed by both parties, Client will have the right to upgrade the Covered Services purchased under that Order Form to a higher volume package of Covered Services offered by

Company. To reflect an upgrade of Covered Services as permitted in this Section 4.2, the parties will amend the original Order Form to reflect the new level of Covered Services purchased by Client and the fees Client will pay for the new level of Covered Services during the remaining term of the Order Form. The amendment will not affect the original term of the Order Form, except that, if Client upgrades its Covered Services during the second year of the term of the original Order Form, the term of that Order Form will be extended so that it remains in effect for at least one year from the effective date of the amendment.

**5.   Invoicing and Payment.**
**5.1 Fees and Payment.** Client will pay Company the fees set forth in the Order Forms and Statements of Work signed by the parties, and invoices issued by Company for Excluded Services. Fees for Covered Services will be payable in advance; fees for Project Services and Excluded Services will be payable in arrears. Unless otherwise specified in an Order Form or Statement of Work, Company will invoice Client on a monthly basis for the Project Services and Excluded Services provided during the preceding month and the Covered Services Company will provide during the following month. All iCore invoices are due upon receipt and all payments must be made in U.S. currency. Customer shall pay monthly recurring charges for any partial month during the Initial Term or any Renewals Term on a pro rata basis.Unpaid invoices that are not the subject of a written good faith dispute are subject to a late payment charge of 1.5% per month on any outstanding balance or the maximum permitted by law, whichever is lower, plus all reasonable expenses and fees of collection. Client shall pay in a timely manner the undisputed portion of any disputed invoice.

**5.2 Billing Disputes.** If Client believes that it has been charged in error, Client must notify Company in writing within thirty (30) days after receipt of Company's invoice. Any billing disputes must be in writing, using an iCore Credit Request Form, and include a detailed statement describing the nature and amount of the disputed charge(s), the reason(s) why a credit or refund is being requested, and sent via certified or overnight mail, return receipt requested, to the attention of:

> Billing Department
> iCore Networks, Inc.
> 7900 Westpark Drive, Suite A-315
> McLean, Virginia 22102

Client shall cooperate fully and in good faith with Company to promptly address and attempt to resolve the disputed charge(s). If Client fails to provide written notice of dispute within the enumerated thirty (30) day deadline, the charges and invoice will be considered correct and binding on Client.

**5.3     Expenses.** Client will reimburse Company for all reasonable out-of-pocket expenses incurred by Company in the course of providing Services under the Agreement including, without limitation, cost of any goods procured on behalf of Client, postage, shipping, travel, lodging, and any other expenses incurred by Company in providing the Service. Company will include all such expenses on its monthly invoices to Client after it incurs such expenses.

**5.4  Taxes.** The fees specified in the Agreement do not include taxes, duties, or other fees. Client shall pay for any sales, use, property, value-added, withholding, and any other taxes based on the Services provided under this Agreement, other than taxes based on Company's net income or payroll taxes.

**6.     Intellectual Property Rights.**
**6.1 Company Property.** Company reserves all rights not expressly granted under the Agreement. Without limiting the generality of the preceding sentence, all ideas, methodologies, inventions, concepts, know-how, techniques, trade secrets, or other intellectual property conceived, developed, or provided by Company, or used by Company to provide Services are and will remain the sole and exclusive property of Company and/or its suppliers ("Company Property"), except that, to the extent such materials incorporate Client's Confidential Information, Client will retain all right, title and interest in and to such Confidential Information.

**6.2 Client Property.** Any tangible and intangible materials in any form (e.g., hardware, computers, software, documentation) furnished by Client and/or accessed by Company for Company to use in providing the Services remain the property of Client ("Client Property") or its vendors. Company will return all Client Property upon termination of this Agreement and payment in full by Client of all fees due and payable under the Agreement.

**6.3 Ownership .**Unless otherwise specified in the applicable Order Form or Statement of Work, all Work Product will belong to Client upon full payment of all fees due and payable under the applicable Order Form or Statement of Work. Notwithstanding the foregoing, in performing or providing any Services under any Order Form or Statement of Work, Client may use Company intellectual property, products, materials (including training materials), information, ideas, concepts, routines, know-how, techniques, tools, templates, models, software, libraries, procedures, documentation, technology, interfaces, databases, graphics, components, reports, processes, best practices, and methodologies owned or licensed by or developed on behalf of Company or any of its suppliers ("Company Intellectual Property"). Client agrees that Company or its suppliers shall retain all right, title and interest (including all patent, copyright, trade secret and other intellectual property rights) in and to all Company Intellectual Property and that no Company Intellectual Property shall be deemed to be a Work Product or a "work made for hire". Client further acknowledges and agrees that Company may modify and/or improve Company Intellectual Property during the course of this Agreement. Client agrees that all such modifications, improvements, and derivative works shall be included within the meaning of "Company Intellectual Property", unless otherwise specifically agreed by the parties in writing. For the avoidance of doubt, Client is not granted any rights, title or interest in or to any Company Intellectual Property and/or any other equipment, supplies, software, tools, documentation, and materials owned, leased, or used by Company. All Company Intellectual Property is deemed to be Company Confidential Information for purposes of this Agreement. Client shall have or obtain no rights in or to any Company Intellectual Property other than pursuant to a separate written agreement or Statement of Work signed by an authorized representative of each party. Notwithstanding any other provision of this Agreement to the contrary and subject to Section 7 below, Company shall be free to use any ideas, concepts, or know-how developed or acquired by Company during the provision of the Services to the extent obtained and retained by Company's personnel as impressions and general learning. Nothing in this Agreement will preclude Company from acquiring, developing, using, enhancing, or marketing services or materials that are similar or related to any Work Product prepared for Client.

**6.4   License Grants.** Subject to the terms and conditions of the Agreement, Client hereby grants Company an irrevocable, worldwide, non-exclusive, royalty-free, fully-paid perpetual right

and license to use any Client Property solely for the purpose of providing Services under this Agreement as well as any Service Order or Statement of Work.

## 7. Confidential Information.

7.1 As used herein, "**Confidential Information**" means all information of a party ("**Disclosing Party**") disclosed to the other party ("**Receiving Party**") that is designated in writing or identified as confidential at the time of disclosure or should be reasonably known by the Receiving Party to be Confidential Information due to the nature of the information disclosed and the circumstances surrounding the disclosure. The terms and conditions of all Order Forms shall be deemed Confidential Information without any marking or further designation. Except as expressly authorized herein, the Receiving Party will hold in confidence and not use or disclose any of the Disclosing Party's Confidential Information. The Receiving Party's nondisclosure obligation shall not apply to information which the Receiving Party can document: (i) was rightfully in its possession or known to it prior to receipt of the Confidential Information; (ii) is or has become public knowledge or publicly available through no fault of the Receiving Party; (iii) is rightfully obtained by the Receiving Party from a third party without breach of any confidentiality obligation; (iv) is independently developed by employees of the Receiving Party who had no access to such information; or (v) is required to be disclosed in order to enforce this Agreement or pursuant to a regulation, law or court order (but only to the minimum extent required to comply with such regulation or order and with advance written notice to the Disclosing Party to the extent legally permitted). The Receiving Party acknowledges that disclosure of Confidential Information could cause substantial harm to the Disclosing Party for which damages alone might not be a sufficient remedy and, therefore, that upon any such disclosure by the Receiving Party, the Disclosing Party shall be entitled to seek appropriate equitable relief in addition to whatever other remedies it might have at law.

7.2 **Confidentiality.** Subject to the terms and conditions of this Agreement, the Receiving Party shall not disclose or use any Confidential Information of the Disclosing Party for any purpose outside the scope of this Agreement, except with the Disclosing Party's prior written permission (which, for purposes of this Section, written consent via email shall be sufficient).

7.3 **Protection.** The Receiving Party shall keep confidential all Confidential Information disclosed to it by the Disclosing Party, and will protect the confidentiality thereof in the same manner as it protects the confidentiality of its own Confidential Information and at all times shall exercise at least a reasonable degree of care in the protection of Confidential Information.

## 8. Warranties and Disclaimers

8.1 **Limited Warranties.** Company warrants that: (i) for thirty (30) days from the closing of the applicable trouble ticket, Company will provide the Covered Services and the Excluded Services in a professional and workmanlike manner, in accordance with generally accepted industry standards; and (ii) for thirty (30) days from the completion of Project Services, Company will provide Project Services substantially in accordance with the terms of the applicable Statement of Work. Client must promptly report in writing any breach of the warranty contained in this Section 8.1 to Company during the relevant warranty period or the provision of the Services shall be deemed to be accepted and approved by Client.

8.2 **Remedies.** As Client's exclusive remedy and Company's entire liability for any breach of the limited warranties set forth in Section 8.1 above, Company will re-perform the non-conforming Services or, if Company is unable to perform the Services as warranted, Company will refund to Client the fees previously paid by Client for that specific portion of the non-conforming Services.

8.3 **Disclaimer.** EXCEPT FOR THE WARRANTIES CONTAINED IN THIS SECTION 8, ALL SERVICES ARE PROVIDED "AS IS" AND "WHERE IS". COMPANY, ON BEHALF OF ITSELF AND ITS LICENSORS AND CONTRACTORS, SPECIFICALLY DISCLAIMS ANY AND ALL OTHER WARRANTIES, WHETHER EXPRESSED, IMPLIED, STATUTORY OR OTHERWISE AND SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES INCLUDING, WITHOUT LIMITATION, THE CONDITIONS AND/OR WARRANTIES OF MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE TO THE MAXIMUM EXTENT PERMITTED BY LAW. All Company warranties are solely to and for the benefit of Client and for no other entity or third party. Company does not warrant that Client's IT Infrastructure will meet Customer's or Client's requirements or that the operation of Client's IT Infrastructure will be uninterrupted or error-free. Further, Company does not warrant that all errors in Client's IT Infrastructure can or will be corrected. Company and its contractors shall not be liable or responsible for any delays, interruptions, delivery or service failures, or any other problems arising from Client's IT Infrastructure.

## 9. Indemnification.

9.1 **Intellectual Property Infringement.** If a third party makes a claim against either Client or Company (in either case, "Recipient") that any information, design, specification, instruction, software, data, or material (collectively or individually, "Material") furnished by either to the other party (the "Provider") and used by the Recipient infringes such third party's intellectual property rights, the Provider will (i) indemnify the Recipient, its Affiliates, and each of their directors, officers, employees, and contractors, against the claim and, at its option, either defend or settle the claim; and (ii) pay all costs, damages and expenses (including reasonable attorneys' fees) finally awarded against the Recipient by a court of competent jurisdiction or agreed to in a written settlement agreement signed by the Provider to resolve such claim. The Recipient shall (1) immediately notify the Provider promptly in writing, but in no event any later than ten (10) business days after the Recipient receives notice of any claim (or sooner if required by law); (2) give the Provider sole control of the defense and any settlement negotiations; and (3) at Provider's expense, give the Provider the information, authority, and assistance the Provider needs to defend against or settle the claim.

9.2 **Alternative Resolution; Exceptions.** If the Provider believes or it is determined that any of the Material may have violated a third party's intellectual property rights, the Provider may choose either to modify the Material to be non-infringing (while substantially preserving its utility or functionality) or obtain a license to allow for continued use of such Material. If the alternatives described in the preceding sentence are, in the Provider's discretion, impractical or not available on a commercially reasonable and feasible basis, the Provider may require the return of the applicable Material and refund, on a pro-rated basis based on the term of the Service or portion of the

undelivered Service, any fees the Recipient may have paid for such Material. If Client is the Provider and such return materially affects Company's ability to meet its obligations under the relevant Order Form or Statement of Work, then Company may, at its option and upon five (5) business days' prior written notice to Client, terminate the Order Form or Statement of Work. Notwithstanding the foregoing, Provider shall have no obligation to indemnify Recipient or have any additional obligations pursuant to this Section 9 to the extent any infringement or alleged infringement results from: (i) any modification to the Material made by any party other than Provider or Provider's authorized representative, (ii) any use of the Material by Recipient or any third party other than as authorized under this Agreement, or (iii) any use of the Material in combination with other information, design, material, specification, software, hardware or data. In addition, the Provider will not indemnify the Recipient to the extent that an infringement claim is based upon any information, design, specification, instruction, software, data, or material not furnished by the Provider. This Section 9 provides the parties' exclusive remedy for any infringement claims or damages.

**10. Limitation of Liability.**
**10.1 Exclusion of Consequential Damages.** EXCEPT FOR A PARTY'S BREACH OF ITS CONFIDENTIALITY OBLIGATIONS UNDER SECTION 7 OF THIS AGREEMENT, IN NO EVENT WILL EITHER PARTY BE LIABLE FOR ANY INDIRECT, INCIDENTAL, PUNITIVE, EXEMPLARY, SPECIAL, OR CONSEQUENTIAL DAMAGES, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF PROFITS, REVENUE, DATA OR USE, INCURRED BY EITHER PARTY OR ANY THIRD PARTY, WHETHER IN AN ACTION IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR WARRANTY, EVEN IF THE OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. The preceding sentence will not be construed to limit either party's obligations to the extent such damages are finally awarded to a third party under a claim subject to indemnification under Section 9 above.

**10.2 Limitation of Direct Damages.** EXCEPT FOR AMOUNTS OWED BY CLIENT TO COMPANY UNDER THIS AGREEMENT, IN NO EVENT WILL THE AGGREGATE LIABILITY OF EITHER PARTY FOR DAMAGES UNDER THIS AGREEMENT, ANY ORDER FORM, AND ANY STATEMENT OF WORK EXCEED THE TOTAL AMOUNTS ACTUALLY PAID OR PAYABLE BY CLIENT, EXCLUSIVE OF ANY OUT-OF-POCKET EXPENSES, DURING THE THREE (3) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO SUCH LIABILITY. IF SUCH DAMAGES RELATE TO PARTICULAR SERVICES, COMPANY'S LIABILITY WILL BE LIMITED TO THE FEES ACTUALLY PAID OR PAYABLE BY CLIENT FOR THE PARTICULAR SERVICES DURING THE THREE (3) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO SUCH LIABILITY EXCLUSIVE OF ANY OUT-OF-POCKET EXPENSES. This Section 10.2 will not be construed as limiting in any way Client's obligation to pay on a timely basis all fees due and payable under the Agreement.

**11. Term and Termination**
**11.1 Term.** This Agreement and the initial Order Form signed by the parties will commence on the Effective Date and remain in effect for the term set forth in the Order Form, unless earlier terminated as provided in this Section 11 (the "Initial Term"). Following the Initial Term, this Agreement and the initial Order Form will automatically renew for successive terms that are identical in length to the Initial Term (each a "Renewal Term" and, together with the Initial Term, the "Term"), unless either party provides written notice to the other party of its intent not to renew the Agreement or the Order Form at least ninety (90) days before the expiration of the Initial Term or the then-current Renewal Term, as applicable. Each additional Order Form signed by the parties after the Effective Date will have a minimum initial term of three (3) years from the effective date of such Order Form and will automatically renew for successive three (3) year terms (each a "Renewal Term") unless either party provides written notice to the other party of its intent not to renew the Agreement or such additional Order Form at least ninety (90) days before the expiration of the Initial Term or the then-current Renewal Term, as applicable. Except for a termination for material breach under Section 11.3 below, if the Term of the Agreement is scheduled forms then in effect the Customer Service Order Agreement, and/or the Universal Terms and Conditions of Service, the Term of any such Order Form(s) will be extended and the Agreement will remain in full force and effect through the expiration of all such Order Forms.

**11.2 Termination by Client for Convenience.** Except as otherwise agreed by the parties in writing and set forth in a particular Statement of Work, Client may terminate a Statement of Work at any time upon thirty (30) days advance written notice to the other party. Upon such termination, Client shall pay Company all fees due and payable under the Statement of Work up through the effective date of termination. Except for the right to terminate a Statement of Work as described in this Section 11.2, if this Agreement or any Order Form is terminated by Client prior to the expiration of the Initial Term or any Renewal Term the in effect and such termination is not due to Company's uncured material breach as set forth in Section 11.3 below or if Company terminates this Agreement or any Order Form pursuant to Section 11.3 below due to Client's uncured material breach, Client shall pay to Company: (a) an early termination charge, which Client agrees is reasonable, equal to all non-recurring and monthly recurring charges for Covered Services as set forth in any Order Form which would otherwise be due through the end of the Initial Term or Renewal Term in effect at the time, including all applicable taxes and fees; (b) for all charges for all Services accrued but unpaid as of the termination date; and (c) any out-of-pocket expenses incurred by Company or imposed on Company (e.g., ordered and non-cancellable equipment, licenses, termination charges). For avoidance of doubt, Client agrees and acknowledges that the foregoing early termination charges shall apply even if Client terminates the Agreement and/or any Order Form prior to when Company begins to provide any Covered Services and/or Project Services. The parties agree that the precise damages resulting from an early termination by Client or termination by Company due to Client's breach are difficult to ascertain and the early termination charges set forth in this Section 11.2 are a reasonable estimate of anticipated actual damages and not a penalty. The early termination charges shall be due and payable within ten (10) days of the effective date of termination.

**11.3 Termination for Material Breach.** Either party may terminate the Agreement, an Order Form, or a Statement of Work upon written notice if the other party materially breaches the Agreement or the applicable Order Form or Statement of Work and fails to cure such material breach within thirty (30) days

from receipt of written notice specifying the alleged breach in detail.

**11.4 Effect of Termination.** Upon termination of the Agreement by either party for a material, uncured breach by the other party, or termination of the Agreement by Client for convenience under Section 11.2 above, all Order Forms and Statements of Work then in effect will terminate on the effective termination date of the Agreement. Termination of the Agreement, an Order Form or a Statement of Work will not limit either party from pursuing other remedies available to it, including injunctive relief, nor will such termination relieve Client of its obligation to pay all fees that have accrued or are otherwise owed by Client under this Agreement and any Order Form or Statement of Work in effect immediately prior to such termination in addition to any early termination charges which are due under Section 11.2 above. The parties' rights and obligations under any provision of the Agreement that by its nature or context is intended to survive any termination, cancellation or expiration of the Agreement, including but not limited to Sections 1, 3.3, 5, 6, 7, 8, 9, 10, 11, and 12 will survive and remain in full force and effect.

**11.5 Handling of Confidential Information upon Termination.** At Client's written request, within thirty (30) days of termination of the Agreement for any reason, provided that Client is not in breach of the Agreement, Company will make available to Client all Client Property and other documentation, files or other tangible items that include the Confidential Information of Client then in Company's possession. Client agrees and acknowledges that Company has no obligation to retain Client Property or Client's Confidential Information and that Company may irretrievably delete such materials at any point more than thirty (30) days following the termination of the Agreement. Upon termination of the Agreement for any reason, Client will promptly return, or, if so directed by Company in writing, destroy all items containing or consisting of Company's Confidential Information.

**12. General Provisions.**

**12.1 Dispute Resolution.** Except for (i) a dispute related to claims subject to indemnification under Section 9 above or(ii) as otherwise provided in this Section 12.1, neither party will resort to legal remedies or commence any formal proceedings to resolve a dispute under the Agreement until the parties have attempted to resolve the dispute through the escalation process described in this Section 12.1. The party raising a dispute will submit to the other party a written notice and supporting material describing all issues and circumstances related to the dispute (a "Dispute Notice"). A primary representative designated by each party will attempt to resolve the dispute. If the parties' primary representatives fail to resolve the dispute within fifteen (15) days from receipt of a Dispute Notice, a Vice President (or higher-level officer) of each party will attempt to resolve it. If the Vice Presidents (or higher-level officers) of the parties are unable to resolve the dispute within thirty (30) days from receipt of the Dispute Notice, either Party may commence formal legal proceedings in accordance with Section 12.4 below to resolve the dispute. This Section 12.1 will not be construed to prevent a party from instituting formal proceedings earlier than indicated in this to: (A) avoid the expiration of any applicable limitations period, (B) preserve a superior creditor position, or (C) seek injunctive relief to prevent an irreparable harm, including, without limitation, harm caused by an actual or threatened breach of confidentiality as set forth in Section 7 above.

**12.2 Waiver; Amendment.** No waiver, modification or amendment of any provision of the Agreement will be valid unless made in writing, signed by both parties, and specifying the nature and extent of such a waiver, modification or amendment. No such waiver, modification or amendment will be construed to be a general waiver, abandonment, modification or amendment of any of the terms, conditions or provisions of the Agreement, and such waiver, modification, and/or amendment will be strictly limited to the extent specified in the signed writing. Similarly, no failure or delay in exercising any right under the Agreement will operate as a waiver of such right or any other right.

**12.3 Entire Agreement.** The Agreement, along with all Order Forms and Statements of Work executed by both parties, is the complete and exclusive statement regarding the subject matter of the Agreement and supersedes all prior and contemporaneous agreements, understandings and communications, oral or written, between the parties regarding the subject matter of this Agreement. If any provision of this Agreement is found to be unenforceable, the remainder will be enforced as fully as possible and the unenforceable provision will be deemed modified to the extent required to permit its enforcement in a manner most closely representing the intention of the parties as expressed in the Agreement.

**12.4 Governing Law.** The Agreement will be construed in accordance with, and all claims relating to or arising out of this Agreement, or breach thereof, whether in contract, tort, or otherwise, shall be governed by the laws of the Commonwealth of Virginia, without giving effect to any choice of law principles. Both parties agree to exclude the United Nations Convention on Contracts for the International Sale of Goods from the transactions contemplated under the Agreement. The parties hereby agree that any dispute, controversy, legal action, suit, proceeding and/or claim arising from or relating to this Agreement (including any Service Order and Statement of Work) or the transactions contemplated under it shall be brought exclusively in the state courts in Fairfax County, Virginia or in federal court in Alexandria, Virginia. The parties hereby consent and submit to the exclusive jurisdiction of such courts. Each party hereto waives any objection based on forum non-conveniens and waives any objection to venue of any action instituted hereunder. Each party irrevocably consents to personal jurisdiction and venue exclusively in, and agrees to service of process issued or authorized by, any such courts.

**12.5 Assignment.** Neither party may assign or delegate any of its rights or obligations under the Agreement without the prior written consent of the other party, which consent will not be unreasonably withheld or delayed; provided, however, that such consent will not be required if (i) a party, upon written notice to the other party, assigns its rights or delegates its obligations under the Agreement to an affiliate of, or a successor-in-interest to, such party or if assignment is to an entity which acquires all or substantially all of a party's assets; or (ii) Company assigns its right to receive payment. The Agreement will be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

**12.6 Compliance with Laws.** The parties will comply with and adhere to all applicable laws, regulations and rules, including all such laws, regulations and rules relating to the export of personal information and technical data. Neither party will export or re-export any personal information or technical data, any products received from the other party, or the direct product of such personal information or technical data, except in accordance with the applicable laws, regulations and rules.

**12.7 Force Majeure.** Except for the obligation to pay all fees due and payable under the Agreement, each party will be excused from performance for any period during which, and to the extent that it or its subcontractor(s) is prevented from performing any obligation or service, in whole or in part, as a result of causes beyond its reasonable control, including, without limitation, acts of God, strikes, lockouts, riots, acts of war, epidemics, communication line failures, failure or unavailability of software and/or equipment, and power failures. Both parties will use reasonable efforts to mitigate the effect of a force majeure event. If such event continues for more than ninety (90) days, either party may cancel unperformed services upon written notice to the other party. This Section 12.7 does not excuse either party's obligation to take reasonable steps to follow its normal disaster recovery procedures or Client's obligation to pay for Services provided by Company.

**12.8 Notices.**

(a) To Client: Unless expressly stated otherwise in this Agreement, in the event Company is required or desires to provide Client with notice under this Agreement, it will provide electronic notice to the e-mail address on file. In the event that Client changes its e-mail address, Client shall advise Company immediately in writing. Client agrees to electronic delivery of all required notifications including invoices, unless otherwise provided for herein.

(b) To Company: Unless expressly stated otherwise in this Agreement, in the event Client is required or desires to provide Company with notice, all correspondence must be in writing and sent, via certified mail, return receipt requested, or overnight courier service, to the following address:

Chief Financial Officer
iCore Networks, Inc.
7900 Westpark Drive, Suite A-315
McLean, Virginia 22102

**12.9 Relationship between the Parties.** Company is an independent contractor; nothing in the Agreement will be construed to create a partnership, joint venture or agency relationship between the parties. Each party will be solely responsible for payment of all compensation owed to its employees, as well as employment related taxes.

**12.10 Counterparts and Exchanges by Fax.** The Agreement and any Order Form or Statement of Work may be executed in one or more counterparts, each of which will be deemed an original, and all of which together will constitute one and the same instrument. Any signed copy of the Agreement, or any Order Form or Statement of Work, copied or reproduced and transmitted (in counterparts or otherwise) via photocopy, facsimile or other process that accurately transmits the original document, will be considered an original document and be sufficient to bind the parties to its terms.

**12.11 Interpretation of Agreement.** This Agreement as well as any Service Order and Statement of Work will be construed and interpreted fairly, in accordance with the plain meaning of its terms, and there will be no presumption or inference against the party drafting this Agreement or any Service Order or Statement of Work in construing or interpreting any of the provisions contained in this Agreement or any Service Order or Statement of Work.

# INVOICE



**VoIP @ the core of your business.**

ICore Networks, Inc.
7900 Westpark Drive
Suite A-315
McLean, VA 22102

| | |
|---|---|
| INVOICE # | T100076 |
| DATE: | January 22, 2014 |

| BILL TO | Alacrity Collections Corporation | SHIP TO | Alacrity Collections Corporation |
|---|---|---|---|
| | 900 Bestgate Road | | 900 Bestgate Road |
| | Suite 407 | | Suite 407 |
| | Annapolis, MD 21401 | | Annapolis, MD 21401 |

| Account Executive | P.O. No. | Terms |
|---|---|---|
| Aaron Pauley | Contract Term | Due Upon Receipt |

| QTY. | Per Month Cost of Contract | Unit Price | Monthly Price |
|---|---|---|---|
| 15 | VoIP Seat Services at $54/user | $54.00 | $810.00 |
| 1 | Auto Attendant Lead Number | $5.00 | $5.00 |
| 1 | Hunt Group Lead Number | $5.00 | $5.00 |
| 12 | Fax2Mail 10 | $10.00 | $120.00 |
| 6 | Call Recording Feature 54 | $54.00 | $324.00 |
| 12 | Individual User Toolbar | $3.00 | $36.00 |
| 1 | Network Monitoring Service | $40.00 | $40.00 |
| 1 | POTS Line at $34/number | $34.00 | $34.00 |
| 1 | DIA Connectivity | $192.84 | $192.84 |
| 1 | T1 Connectivity | $328.80 | $358.80 |
| 1 | FUSF Fees | $161.32 | $161.32 |
| 1 | Regulatory Recovery Fees | $64.04 | $64.04 |

| MONTH | One-time Setup NRCs | Unit Price | One-time Price |
|---|---|---|---|
| 15 | VoIP Seat Service Setup NRC at $54/user | $54.00 | $810.00 |
| 1 | Auto Attendant Lead Number Setup NRC | $150.00 | $150.00 |
| 1 | Hunt Group Lead Number Setup NRC | $5.00 | $5.00 |
| 6 | Call Recording Setup NRC | $54.00 | $324.00 |
| 12 | Individual User Toolbar Setup NRC | $3.00 | $36.00 |
| 1 | Network Monitoring Service Setup NRC | $40.00 | $40.00 |
| 1 | POTS Line Setup NRC at $34/number | $34.00 | $34.00 |
| 1 | DIA Connectivity Setup NRC | $240.00 | $240.00 |
| 1 | T1 Connectivity Setup NRC | $323.80 | $323.80 |
| 1 | FUSF Fees | $149.84 | $149.84 |
| 1 | Regulatory Recovery Fees | $3.17 | $3.17 |

| MONTH | Remaining Length of Contract: 36 Months (Full Length of Contract) | Monthly Price | Term Price |
|---|---|---|---|
| 36 | VoIP Seat Services at $810/month | $810.00 | $29,160.00 |
| 36 | Auto Attendant Lead Number | $5.00 | $180.00 |
| 36 | Hunt Group Lead Number | $5.00 | $180.00 |
| 36 | Fax2Mail 10 | $120.00 | $4,320.00 |
| 36 | Call Recording Feature 54 | $324.00 | $11,664.00 |
| 36 | Individual User Toolbar | $36.00 | $1,296.00 |
| 36 | Network Monitoring Service | $40.00 | $1,440.00 |
| 36 | POTS Line at $34/number | $34.00 | $1,224.00 |
| 36 | DIA Connectivity | $192.84 | $6,942.24 |
| 36 | T1 Connectivity | $358.80 | $12,916.80 |
| 36 | FUSF Fees | $161.32 | $5,807.47 |
| 36 | Regulatory Recovery Fees | $64.04 | $2,305.29 |

| | | |
|---|---|---|
| | Subtotal | $79,551.61 |
| | Previously Received Deposit | N/A |
| | TOTAL AMOUNT DUE | $79,551.61 |

Make all checks payable to ICore Networks, Inc

**V I R G I N I A :**

*FILED*
*CIVIL INTAKE*
*2014 DEC 12 PM 3:2:*
*JOHN T. FREY*
*CLERK, CIRCUIT COURT*
*FAIRFAX, VA*

IN THE FAIRFAX COUNTY CIRCUIT COURT

**ICORE NETWORKS, INC.,**                        *

      Plaintiff,                                *

v.                                               *    Case No. **2014-16038**

**ALACRITY COLLECTIONS**                         *
**CORPORATION,**                                 *

<u>Serve:</u>                                    *
Susan K. Hayes, Resident Agent                   *
900 Bestgate Road, Suite 407                     *
Annapolis, Maryland  21401                       *

      Defendant.                               *

**PLAINTIFF'S AFFIDAVIT OF DAMAGES**
<u>**UNDER VIRGINIA CODE § 8.01-28**</u>

**COMMONWEALTH OF VIRGINIA**

**COUNTY [CITY] OF** _____, to-wit:

      Before me, the undersigned Notary Public in and for the County [City] and

State/Commonwealth referenced above, personally appeared **TIM BROWNE,** authorized

agent for Plaintiff, iCore Networks, Inc., in the above-styled action, who, after being duly

sworn, deposes and states that, to the best of his knowledge and belief, as follows:  (i) the

amount of Plaintiff's claim against **ALACRITY COLLECTIONS CORPORATION,**

Defendant in the above-styled action, is $79,551.61, exclusive of interest, costs and attorney's

fees; (ii) the foregoing amount is justly due; (iii) Plaintiff claims pre-judgment and post-

judgment interest at the rate of 18% per year from February 22, 2014, until paid; and (iv)

Plaintiff claims attorney's fees pursuant to the Customer Service Order Agreement and

Universal Terms and Conditions of Services attached as exhibits to the Complaint.

**ICORE NETWORKS, INC.**

By: _____
Tim Browne
Vice President of Finance

Subscribed and sworn to before me this 9Th day of December, 2014.

_____
Notary Public

My Commission Expires: 5/31/2016

4817-1875-3568, v. 1

2



# McMillan Metro, P.C.

ATTORNEYS AT LAW

February 20, 2014

*(VIA E-MAIL & FIRST-CLASS MAIL)*

iCore Networks
Attn: Kelena Mills, AR Supervisor
7900 Westpark Drive, Suite A-315
McLean, Virginia 22102

John C. Fredrickson
Shareholder

Direct. 240-778-2314
jfredrickson@mcmillanmetro.com

Maryland Bar

      Re:    Alacrity Collections Corporation

Dear Ms. Mills:

      I have been retained by Alacrity Collections Corporation ("Alacrity") to represent it relative to iCore Networks, Inc.'s ("iCore's") claim for liquidated damages pursuant to an alleged contract. If iCore is represented by legal counsel you should provide this letter to that attorney.

      I have reviewed the facts regarding iCore's solicitation of Alacrity, representations made by iCore and materials upon which iCore bases its claim. From this review I have concluded and explain below, that iCore made material false representations to Alacrity that induced my client's unauthorized representative, Barry Allen, to sign a "Customer Service Order Agreement" (the "Service Order"). Even if the Customer Order was enforceable, which it is not, iCore's claim for liquidated damages is also unenforceable, as it is clearly an effort to enforce a penalty, is completely unrealistic and has no relationship to any actual damage that iCore could arguably have sustained.

      The sole alleged legal basis of iCore's claimed liquidated damages of $79,551.61 is the Service Order which you argue is an enforceable contract. Although the Service Order was signed by Alacrity's IT Manager, Barry Allen, it is nonetheless unenforceable as a contract. iCore representative Aaron Pauley directly solicited business from Alacrity when he, without invitation, visited Alacrity's offices in Annapolis, Maryland. iCore representatives then arranged to meet with Mr. Allen at Alacrity's office in Annapolis. iCore representatives conducted all of their negotiations with Alacrity in Maryland at meetings on December 6, 10 and 11, 2013. At each of those meetings iCore representatives, Aaron Pauley and/or Kevin Thomsen, were told and they agreed, that Mr. Allen did not have authorization to execute any contract on behalf of Alacrity. The iCore

representatives were told repeatedly and they repeatedly acknowledged that any contract between Alacrity and iCore required prior approval by Alacrity's President, Susan Hayes, and that only Ms. Hayes was authorized to sign such a contract on behalf of Alacrity. Although the iCore representatives acknowledged that only Ms. Hayes could bind Alacrity, they persuaded Mr. Allen to sign the Service Order with the promise that it was only for the purpose of locking in the quoted pricing and nothing more. It was only due to the representation by iCore's representatives that the Service Order was not a binding contract and that Alacrity's President would have the final say whether to enter into a final contract, that Mr. Allen signed the document. Thus, the alleged contract was procured through a material representation and is not enforceable. The Restatement (Second) of Contracts Section 164(1) makes clear that: "If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient." Both Virginia and Maryland courts have established that fraud or constructive fraud are grounds for the rescission of a contract. See *Abi-Najm v. Concord Condo., LLC,* 280 Va. 350, 362, 699 S.E.2d 483, 489-90 (2010) (quoting *George Robberecht Seafood, Inc. v. Maitland Bros. Co.* 220 Va. 109, 111-12, 255 S.E.2d 682, 683 (1979)); *Julian v. Buonassissi,* 414 Md. 641, 667, 997 A.2d 104, 119 (2010). Given the facts of this situation and the strong legal precedent, it is entirely likely that a court would determine the conduct of iCore to be fraudulent and the Service Order would thereby be deemed unenforceable.

In the extremely unlikely event that a court determined that the Service Order was an enforceable contract, the liquidated damages claimed by iCore have no support in law. Even if a court was to ignore the fact that representatives of Alacrity made clear that Mr. Allen had no authority to sign a final contract, Alacrity notified iCore on December 11th that it would not enter into a final contract. It was on December 11th when Ms. Hayes made clear that she would not sign a final contract and would not issue a down payment check because of iCore's horrendous "F" rating from the Better Business Bureau. Further, because Alacrity rightly refused to enter into a final contract with iCore, Alacrity paid no initial payment as iCore had requested to be paid on December 11th. Therefore, iCore made no purchases of equipment, incurred no charges on behalf of Alacrity and was not damaged in any way. On December 11th, before Mr. Pauley left the offices of Alacrity, iCore was fully informed that there was no final contract. Because Alacrity clearly communicated its position to iCore, it was impossible for iCore to be misled and for it to incur actual damages.

Ms. Kelena Mills
February 20, 2014
Page 3

In the absence of any actual damages, iCore now claims liquidated damages that appear to be nothing more than the full cost for the three years of services that it would have provided to Alacrity had the parties reached an agreement and entered into a final contract. iCore's calculation of liquidated damages has no relationship to actual damages and is not enforceable. Courts in both Virginia and Maryland have consistently refused to enforce liquidated damage provisions when the amounts claimed are substantially in excess of actual damages. See *Boots, Inc. v. Prempal Singh*, 274 Va. 513, 516-18, 649 S.E.2d 695, 697-98 (2007) where the court reiterated its prior conclusion that "a liquidated damages clause will be construed as an unenforceable penalty 'when the damage resulting from a breach of contract is susceptible of definite measurement, or where the stipulated amount would be grossly in excess of actual damages.'" See also, *Balto. Bridge Co. v. United Rys. & Electric Co.*, 125 Md. 208, 214–15, 93 A. 420, 422–23 (1915), where the court ruled that a liquidated damages clause will be deemed invalid as a penalty where the amount agreed upon is "grossly excessive and out of all proportion to the damages that might reasonably have been expected to result from such breach of the contract." See also, *Willard Packaging Co., Inc. v. Javier*, 169 Md. App. 109, 123, 899 A.2d 940, 948 (2006) where the court concluded that "[u]nder the penalty doctrine, a liquidated damages provision fixing an unreasonably large liquidated damages amount is void as a penalty. *See* Restatement § 356 ("Damages for breach by either party may be liquidated ... but only at an amount that is reasonable in the light of the anticipated or actual loss[.]")."

There are other defenses that would be asserted by Alacrity if the need arose, however, there is no need to outline additional reasons for the unenforceability of iCore's alleged contract and the damages it seeks. Although Alacrity is fully justified in taking the position that it does not owe liquidated damages to iCore, it would prefer that the companies part ways on reasonable terms. If iCore would agree to engage in a good faith discussion with Alacrity about actual damages and a reasonable resolution of this dispute, then I would be willing to facilitate that discussion.

Sincerely,

John C. Fredrickson

SPS

### COMMONWEALTH OF VIRGINIA
### CIRCUIT COURT OF FAIRFAX COUNTY
#### 4110 CHAIN BRIDGE ROAD
#### FAIRFAX, VIRGINIA 22030
#### 703-691-7320
#### (Press 3, Press 1)

ICore Networks Inc  vs.  Alacrity Collections Corporation

CL-2014-0016038

TO:    Alacrity Collections Corporation
       Serve: Susan K Hayes, R/A
       900 Bestgate Road, Suite 407
       Annapolis MD 21401

### SUMMONS – CIVIL ACTION

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the Clerk's office of this Court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

APPEARANCE IN PERSON IS NOT REQUIRED BY THIS SUMMONS.

Done in the name of the Commonwealth of Virginia, on December 15, 2014.

JOHN T. FREY, CLERK

By: _____
                /Deputy Clerk

Plaintiff's Attorney:  David N. Goldberg